### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

PERRY ALEXANDER TAYLOR,

      Petitioner,

-vs-                                       Case No. 8:10-cv-382-T-30AEP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

### ORDER

This cause is before the Court on Petitioner Perry Alexander Taylor's ("Petitioner" or "Taylor") petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("petition") (Dkt. 1). Taylor is a Florida prisoner under sentence of death. Respondent filed a response to the petition (Dkt. 10), and Taylor filed a reply (Dkt. 13). Upon consideration of each of Taylor's claims, the Court has determined that none merits relief. Thus, Taylor's request for federal habeas relief must be **DENIED**.

### BACKGROUND

Taylor was convicted in 1989 of first-degree murder and sexual battery with great force. He was sentenced to death on the first-degree murder charge.[1] The convictions were affirmed by the Florida Supreme Court on June 27, 1991. *See Taylor v. State*, 583 So.2d 323 (Fla. 1991). The

---

[1] He was sentenced to life imprisonment on the sexual battery with great force charge.

Florida Supreme Court, however, vacated Taylor's death sentence, and remanded for resentencing before a new jury.  *Id*.

On June 23, 1992, Taylor was again sentenced to death.  His sentence was affirmed by the Florida Supreme Court on May 5, 1994.  *See Taylor v. State*, 638 So. 2d 30 (Fla. 1994).   His petition for writ of certiorari in the United States Supreme Court was denied on November 14, 1994. *See Taylor v. Florida*, 513 U.S. 1003 (1994).

Taylor initiated state court post-conviction proceedings in March 1996. In February 2006, the state trial court denied his post-conviction motion.  On January 29, 2009, the Florida Supreme Court affirmed the denial of Taylor's post-conviction motion, and denied his petition for writ of habeas corpus.   *See Taylor v. State*, 3 So. 3d 986 (Fla. 2009).   The Florida Supreme Court's mandate issued on February 16, 2009.

Petitioner filed the instant federal habeas petition on February 5, 2010.

**FACTS**[2]

Taylor was charged with the murder and sexual battery of Geraldine Birch ("Birch") whose severely beaten body was found in a dugout at a little league baseball field. Shoe prints matching Taylor's shoes were found at the scene. Taylor confessed to killing Birch but claimed that the sexual contact was consensual and that the beating from which she died was done in a rage without premeditation. Taylor testified that on the night of the killing, he was standing with a small group of people when Birch walked up. She talked briefly with others in the group and then all but Taylor

---

[2]The facts surrounding the murder are taken from the Florida Supreme Court's opinion affirming the convictions, but reversing the sentence of death on direct appeal.  *Taylor v. State*, 583 So.2d 323, 325 (Fla. 1991).

and a friend walked off. Taylor testified that as he began to walk away, Birch called to him and told him she was trying to get to Sulphur Springs. He told her he did not have a car. She then offered sex in exchange for cocaine and money. Taylor agreed to give her ten dollars in exchange for sex, and the two of them went to the dugout.[3]

Taylor testified that when he and Birch reached the dugout they attempted to have vaginal intercourse for less than a minute. She ended the attempt at intercourse and began performing oral sex on him. According to Taylor, he complained that her teeth were irritating him and attempted to pull away. She bit down on his penis.  He choked her in an attempt to get her to release him.  After he succeeded in getting her to release her bite, he struck and kicked her several times in anger.

The jury convicted Taylor on both counts.  Upon the jury's unanimous recommendation, the trial judge sentenced Taylor to death. The Florida Supreme Court, however, reversed the sentence of death and remanded for resentencing before a new jury.

The new jury recommended death by an eight to four vote.[4]  The judge found the following aggravating factors:

(1) Taylor had a previous felony conviction involving the use or threat of violence; (2) the capital felony occurred during the commission of a sexual battery; and (3) the capital felony was especially heinous, atrocious, or cruel. The court found no statutory mitigators but did give some

---

[3]The testimony of defense witnesses Otis Allen and Adrian Mitchell, friends of Taylor, corroborated this portion of Taylor's testimony. Allen testified that he heard Birch tell Taylor that she wanted to have sex for money or crack cocaine and that he saw Birch and Taylor walk off toward the little league park together. Mitchell testified that he saw Birch talking to Taylor, then she walked away and he followed as though they were together.

[4]The facts surrounding the sentence of death are taken from the Florida Supreme Court's opinion affirming the sentence of death on direct appeal after resentencing.  *Taylor v. State*, 638 So.2d 30, 31-32 (Fla. 1994).

weight to Taylor's deprived family background and the abuse he was reported to have suffered as a child. The court considered but gave little weight to Taylor's remorse, to psychological testimony that while Taylor has above-average intelligence, he suffers from an organic brain injury, and to testimony concerning Taylor's good conduct in custody. The judge determined that the aggravating circumstances outweighed the mitigating factors and sentenced Taylor to death.

**STANDARDS OF REVIEW**

Because Taylor filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Henderson v. Campbell*, 353 F.3d 880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections*, 304 F.3d 1345, 1346 (11th Cir. 2002). The ultimate issue with respect to each claim is whether the Florida Supreme Court's resolution of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). *Williams v. Taylor*, 529 U.S. 362 (2000); *Robinson v. Moore*, 300 F.3d 1320 (11th Cir. 2002); *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318 (11th Cir. 2002). The standard Taylor must meet could not be higher; it is not enough that the state court "got it wrong." Petitioner must show that the state court's decision was objectively unreasonable. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor, supra*).

In the event constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). The test is "less onerous" than the harmless error standard enunciated in *Chapman v. California*, 386 U.S. (1967). "The test is

whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637. Although no constitutional error has occurred in Taylor's case, any possible error would be harmless beyond any reasonable doubt based on the facts and the record.

No evidentiary hearing is required because none of Taylor's claims turn on any unresolved issue of fact.  All involve issues of law argued on the basis of the existing record.[5]

**Ineffective Assistance of Counsel Standard**

To prevail on a claim of ineffective assistance of trial or appellate counsel, a petitioner must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland's* two-part test requires a petitioner to demonstrate that counsel's performance was deficient and "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*  If a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

**Procedural default**

A § 2254 application cannot be granted unless a petitioner "has exhausted the remedies available in the courts of the State; . . ." 28 U.S.C. 2254(b)(1)(A); *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998). In other words, the state prisoner must give the state courts an opportunity

---

[5]The state post-conviction court conducted evidentiary hearings. Its findings are "presumed to be correct" (28 U.S.C. § 2254(e)(1)) and there is no showing that its decision "was based on an unreasonable determination of the facts. . ." (28 U.S.C. § 2254(d)(2)).

to act on his claims before he presents those claims to a federal court in a habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). *See also, Henderson v. Campbell*, 353 F.3d at 891 ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.")(quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)); *Duncan v. Henry*, 513 U.S. 364, 365 (1995)("[E]xhaustion of state remedies requires that the state prisoner 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners' federal rights[.]'") (citation omitted).

Under the procedural default doctrine,  "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). "The doctrine of procedural default was developed as a means of ensuring that federal habeas petitioners first seek relief in accordance with established state procedures." *Henderson*, 353 F.3d at 891 (quoting *Judd v. Haley*, 250 F.3d at 1313).

Pre-AEDPA decisions from the Supreme Court establish the framework governing procedural default in federal habeas cases. A procedural default will only be excused in two narrow circumstances. First, petitioner may obtain federal habeas review of a procedurally defaulted claim if he shows both "cause" for the default and actual "prejudice" resulting from the default. "Cause" ordinarily requires petitioner to demonstrate that some objective factor external to the defense

impeded the effort to raise the claim properly in the state court. *Henderson*, 353 F.3d at 892; *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995).

To show "prejudice," the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his factual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Hollis v. Davis*, 941 F.2d 1471, 1480 (11th Cir. 1991) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). The petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different. *Henderson*, 353 F.3d at 892.

Second, a petitioner may obtain federal habeas review of a procedurally defaulted claim, without a showing of cause or prejudice, if such review is necessary to correct a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Henderson*, 353 F.3d at 892. This exception is only available "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Henderson*, 353 F.3d at 892. The fundamental miscarriage of justice exception concerns a petitioner's "actual" innocence rather than his "legal" innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (citing *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986) (explaining a "fundamental miscarriage of justice" occurs "in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent"). To meet this standard, a petitioner must "show that it is more likely than not that no reasonable juror would have convicted him" of the underlying offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). In addition, "'to be credible,' a claim of actual innocence must be based on [new] reliable evidence

not presented at trial." *Calderon*, 523 U.S. at 559 (quoting *Schlup*, 513 U.S. at 324) ("given the rarity of such evidence, in virtually every case, the allegation of actual innocence has been summarily rejected") (internal quotation marks omitted). The *Schlup* Court stated the petitioner must show constitutional error coupled with "new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. This fundamental miscarriage of justice exception is not available unless "the petitioner shows, as a factual matter, that he did not commit the crime of conviction." *Ward v. Cain*, 53 F. 3d 106, 108 (5th Cir. 1995)(denying certificate of probable cause)(footnote omitted).

**DISCUSSION**

**Ground One**

"THE TRIAL COURT ERRED IN FAILING TO REQUIRE THE PROSECUTOR TO GIVE A REASONABLE, RACIALLY NEUTRAL EXPLANATION FOR HIS EXCUSAL OF PROSPECTIVE JUROR FARRAGUT."

In Ground One, Taylor asserts that during the 1989 guilt phase trial only four of the fifty prospective jurors for Taylor's trial were black. When the prosecutor used a peremptory challenge to excuse prospective juror William Farragut ("Farragut"), a black male, defense counsel objected and argued that the prosecutor was striking Farragut solely because he was black. The prosecutor responded that he was not systematically excusing blacks because by excusing Farragut, the next potential juror, Marneese Mitchell, a black female, was going to be placed on the jury panel. Taylor argues that the trial court erred when it found that it "cannot make a finding the State is at this time systematically excluding blacks from the jury" without requiring the prosecutor to state his reasons

for excusing Farragut.  He further argues that the state trial court applied the wrong standard of law, i.e., that it was required to find the State was "systematically excluding blacks from the jury."

Taylor next asserts that shortly after Farragut was excused, the prosecutor moved to exclude Jacqueline Boyd ("Boyd"), a black woman.  Defense counsel objected.  The court then stated that "I now find the State may well be systematically removing blacks from this jury panel" and "I will require the State to give a valid reason for exercising a peremptory challenge as to Jacqueline Boyd...."  The prosecutor then offered his reasons for exercising a peremptory challenge as to Boyd. The prosecutor, however, subsequently withdrew his peremptory challenge, and Boyd served on the jury.  Taylor asserts that the prosecutor's explanation for his attempted excusal of Boyd "was a mere pretext for racial discrimination" and supports the conclusion that the prosecutor's peremptory strike of Farragut was racially motivated.  Thus, Taylor argues, at that point the court was obligated to require the prosecutor to explain the reason for his peremptory strike against Farragut.

Taylor raised this issue on direct appeal in 1991. The Florida Supreme Court denied the claim on its merits, holding as follows:

> Taylor raises three issues related to the guilt phase of his trial. First, he contends that the trial court erred by failing to conduct a *Neil* inquiry upon the prosecutor's peremptory challenge of a black prospective juror. *State v. Neil*, 457 So. 2d 481 (Fla. 1984), *clarified, State v. Castillo*, 486 So. 2d 565 (Fla. 1986), established the test for determining whether a party is exercising peremptory challenges on the basis of improper bias. The complaining party must make a timely objection, demonstrate that the challenged persons are members of a distinct racial group, and show a strong likelihood that they were challenged because of their race. If the trial court determines that there is such a substantial likelihood, the other party must show that the challenges were not exercised solely because of the jurors' race. If the court determines no such likelihood exists, no inquiry into the challenges is required. *Neil*, 457 So. 2d at 486-87.

During jury selection Taylor, who is black, objected to the state's peremptory challenge of prospective juror Farragut. Farragut was one of four black members of the venire and the first black to reach the jury box. In response to the *Neil* motion, the prosecutor told the court that he was not systematically excluding blacks from the panel because the effect of striking Farragut was to place a black woman on the panel. The trial judge stated that he could not at that time find that the state was systematically excluding blacks from the jury and did not require the state to give its reasons for challenging juror Farragut. Defense counsel then exercised a peremptory challenge against the black woman. Later in the jury selection, the state exercised a peremptory challenge against the third black prospective juror to reach the jury box. Defense counsel again made a *Neil* motion, and the following interchange occurred:

THE COURT: I will require the State to give a valid reason for exercising a peremptory challenge as to Jacqueline Boyd since there is no other black left on this panel other than Charlie Robinson, who unequivocally stated that he could never vote to recommend death. I now find the State may well be systematically removing blacks from this jury panel.

MR. BENITO [prosecutor]: My concern with Ms. Boyd would be the fact that she has two children [and] my reading of her questionnaire seemed to indicate that she lived in the area where this offense took place.

THE COURT: What was your first reason, Mr. Benito? The second one, merely because she lives in the area, I don't find is any reason peremptorily or not to challenge somebody. What was the first reason?

MR. BENITO: The fact that she has two children.

THE COURT: [Does] the Defense want Jacqueline Boyd on their jury? . . . Or [do] the Defense and the State want to excuse her, and then I don't have to worry about whether the State is systematically excluding blacks.

. . . .

MR. BENITO: I was incorrect as to where she lived, Judge. . . . Judge, I will leave it up to the Defense. They can either have Jacqueline Boyd or Linda Custer, the one after Ms. Boyd.

MR. SINARDI [defense counsel]: Judge, again we would renew our previous objections to the State.

THE COURT: He is withdrawing it.

10

MR. SINARDI: That's fine, then.

Ms. Boyd served on the jury.

> FN3 Under the procedure being followed for jury selection, all prospective jurors were examined on voir dire, after which the state and the defense exercised their challenges at a single conference. Each juror was numbered, and as any of the first twelve were challenged, the next numbered juror would be added to the panel, subject to further challenge.

Taylor claims two errors occurred here. First, he argues that the trial court applied the incorrect standard when it determined that the state was not systematically excluding blacks and denied his *Neil* motion with respect to juror Farragut. Second, he contends that once the trial judge found, upon the challenge to juror Boyd, that the state might be exercising its peremptory challenges discriminatorily the court was required to obtain the state's reasons for the earlier challenge of juror Farragut.

We find no error in the trial court's initial refusal to require the state to provide its reasons for challenging juror Farragut because defense counsel did not demonstrate a strong likelihood that Farragut was challenged solely because of his race. Farragut was the first and, as a result of the withdrawal of the challenge to juror Boyd, the only black challenged by the state. We realize that under *State v. Slappy*, 522 So. 2d 18, 21 (Fla.), *cert. denied*, 487 U.S. 1219, 108 S.Ct. 2873, 101 L. Ed. 2d 909 (1988), the striking of even a single black juror for racial reasons is impermissible. *See also Reynolds v. State*, 576 So. 2d 1300 (Fla. 1991) (striking of only black venire member shifts burden to require justification for challenge). However, on this record, the mere fact that the state challenged one of four black venire members does not show a substantial likelihood that the state was exercising peremptory challenges discriminatorily, particularly since the effect of the challenge was to place another black on the jury. *See Woods v. State*, 490 So. 2d 24, 26 (Fla.) (three peremptories exercised by state against blacks did not rise to level needed to require trial court to inquire into state's motives for challenges), *cert. denied*, 479 U.S. 954, 107 S. Court. 446, 93 L. Ed. 2d 394 (1986). The record does not reveal the requisite likelihood of discrimination to necessitate an inquiry into the state's reasons for challenging juror Farragut.

In support of his second contention, Taylor relies on *Thompson v. State*, 548 So. 2d 198 (Fla. 1989). In *Thompson*, defense counsel raised timely *Neil* objections when the state exercised several peremptory challenges against black prospective jurors. The trial court did not require the state to provide the reasons for the challenges. However,

after the state exercised a peremptory challenge against black prospective juror Bell, the court found that the state was systematically excluding blacks from the jury and asked the state to give its reasons for the challenge. However, the prosecutor told the court that he could not be systematically excluding because "you got a black sitting on the jury after I excuse Mr. Bell[.]" *Thompson*, 548 So. 2d at 201. The trial judge then determined that the state was not systematically excluding blacks, did not require the state to provide its reasons for challenging juror Bell, and continued to allow the state to exercise peremptory challenges against black jurors without explanation. Ultimately, the trial court determined that the state was systematically excluding black prospective jurors and required the state to explain its challenge to a black juror. Thereafter, the state continued to exercise peremptory challenges against blacks but offered explanations for each strike. However, the state did not give, nor did the trial court require, reasons for the challenges to the first black jurors challenged by the state. In determining that a *Neil* violation occurred, this Court concluded:

> The record reflects that the trial court below clearly entertained serious doubts as to whether the state was improperly exercising its peremptory challenges. Accordingly, the court should have resolved this doubt in favor of the defense and conducted an inquiry as to the state's reasons for all the challenged excusals. *Slappy*, 522 So. 2d at 21-22. These reasons must be supplied by the prosecutor. Here, the trial court conducted an improper inquiry because it failed to question the state as to each and every peremptory challenge exercised against blacks once it became clear that the state might be improperly exercising its peremptory challenges. For this reason alone, we must reverse.

*Thompson*, 548 So. 2d at 202. Thus, once a sufficient doubt is raised that a prospective juror may have been eliminated because of race, "the trial court must require the state to explain each one of the allegedly discriminatory challenges." *Williams v. State*, 574 So. 2d 136, 137 (Fla. 1991).

However, the prosecutor's withdrawal of the challenge to Juror Boyd distinguishes this case from *Thompson*. The withdrawal, which was accepted by defense counsel, removed the court's determination that the state might be exercising peremptory challenges discriminatorily. This eliminated the requirement that the court look back to the state's reasons for challenging juror Farragut. We caution, however, that a party may not continually withdraw peremptory challenges in order to avoid an inquiry into the reasons for other challenges to minority jurors. If it becomes apparent that a party is withdrawing challenges to minority jurors to avoid the requirements of *Neil*, the state must be required to provide the reasons for all allegedly discriminatory challenges.

12

*Taylor v. State*, 583 So. 2d 323, 326-328 (Fla. 1991).

Taylor essentially claims that he was denied a jury of his peers because the prosecutor had a racially-discriminatory motivation for requesting a peremptory strike on Farragut, a prospective black juror. "[R]acial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller-El v. Dretke*, 545 U.S. 231, 238 (2005) (quoting *Georgia v. McCollum*, 505 U.S. 42, 44 (1992)). In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court established the test to be used in determining whether either party engaged in race-based exclusions of potential jurors through peremptory challenges. The test involves a three-step inquiry:

> First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." 476 U.S., at 93-94, 106 S. Court. 1712 (citing *Washington v. Davis*, 426 U.S. 229, 239-242, 96 S. Court. 2040, 48 L. Ed. 2d 597 (1976)) (footnote omitted). Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes. 476 U.S., at 94, 106 S. Court. 1712; *see also Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S. Court. 1221, 31 L. Ed. 2d 536 (1972). Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767, 115 S. Court. 1769, 131 L. Ed. 2d 834 (1995) (*per curiam*).

*Johnson v. California*, 545 U.S. 162, 168 (2005).

It appears Taylor argues that the Florida Supreme Court's determination of this claim was contrary to or an unreasonable application of *Batson*. Under *Batson*, "[o]nce a prima facie case has been established, the burden shifts to the prosecutor to articulate a clear, reasonably specific and neutral explanation for challenging the black jurors." *United States v. Allison*, 908 F.2d 1531, 1536 (11th Cir. 1990) (internal quotations and citation omitted). It is not true, however, "that all peremptory strikes of black venirepersons are for racial reasons. In making out a prima facie case,

13

the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal. The defendant must identify facts and circumstances that support the inference of discrimination, such as a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, or the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons." *Id*. at 1538.

Having reviewed the record, the Court concludes that Taylor failed at trial to make out a prima facie case of purposeful discrimination. When the State challenged Farragut, defense counsel stated "Judge, Mr. Farragut is my understanding at this point in time the only black that is on the panel, and I would submit that he is striking - - has struck him simply because of his race, and not for any legitimate reasons for his ability to render a fair and impartial trial." (Respondent's Ex. A-8 at p. 1000). Defense counsel, however, did not present the trial court with any evidence in support of a *Batson* violation. When the State subsequently challenged Boyd, defense counsel stated "[w]e are going to interpose the same objection as we did before. Is [sic] that the State is systematically excluding all blacks from the jury, and previously excluded Mr. Farragut, and now they are excusing the only other black. The Defense excluded Ms. Mitchell because her husband is a law enforcement officer, and has been a Tampa Police Department officer." (Id. at p. 1004).[6] Thus, the only arguable

---

[6]The Court notes that in the course of defense counsel's second *Batson* challenge, the challenge pertaining to Boyd, defense counsel never asked the trial judge to revisit the ruling regarding Farragut (Respondent's Ex. A-8 at pp. 1004-1006).

evidence of a *Batson* violation Taylor presented at trial was that the State moved to strike two of the four black potential jurors.[7]

"The absence of an obvious race-neutral reason for excluding a juror is not sufficient to establish a prima facie showing of racial motivation." *Cousin v. Bennett*, 511 F.3d 334, 339 n.1 (2d Cir. 2008) (citing *Allison*, 908 F.2d 1531). "Merely asking for a race neutral explanation, without any additional support or argument, is not enough to meet the defendant's burden of making a prima facie case under the [sic] *Batson*..." *Guerrero v. Payant*, 2010 U.S. Dist. LEXIS 61723, at *46 (E.D.N.Y. June 21, 2010) (citations omitted). Taylor did not establish a prima facie case of discrimination under *Batson*, and therefore the prosecutor was not required to articulate reasons for challenging Farragut.

Even if, *arguendo*, Taylor had established a prima facie case of discrimination after the prosecutor challenged Boyd, defense counsel did not ask the judge to revisit the prosecutor's challenge to Farragut. Taylor does not demonstrate that pursuant to *Batson*, the trial judge was obligated to *sua sponte* revisit the prosecutor's challenge to Farragut and require him to explain his reasons for the challenge. *See United States v. Bernal-Benitez*, 594 F.3d 1303, 1312-1313 (11th Cir. 2010) (where defendant made prima facie showing that the Government's peremptory challenge was

---

[7]Significantly, the State withdrew its peremptory challenge as to Boyd (Respondent's Ex. A-8 at p. 1005). Thus, the State ultimately challenged one of the four black venire members. *See Aspen v. Bissonnette*, 480 F.3d 571, 577 (1st Cir. 2007) ("In considering *Batson* claims, courts examine both numeric and non-numeric forms of evidence. Relevant numeric evidence includes the percentage of strikes directed against members of a particular group, *e.g., Paulino*, 371 F.3d at 1091, the percentage of a particular group removed from the venire by the challenged strikes, *e.g., Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995), *abrogated on other grounds, Tolbert v. Page*, 182 F.3d 677, 684 (9th Cir. 1995), and a comparison of the percentage of a group's representation in the venire to its representation on the jury, *e.g., United States v. Sangineto-Miranda*, 859 F.2d 1501, 1521-22 (6th Cir. 1988).").

based on race, judge's failure to *sua sponte* reconsider any ruling it previously may have made on a *Batson* objection based on the same race was not plain error).

On the record before this Court, the Court cannot say that the Florida Supreme Court's decision was contrary to or an unreasonable application of clearly established federal law. Accordingly, Ground One does not warrant relief.

**Ground Two**

"THE TRIAL COURT ERRED IN EXCLUDING CRITICAL CORROBORATIVE EVIDENCE PROFFERED BY THE DEFENSE IN DEROGATON [sic] OF THE FEDERAL CONSTITUTIONAL RIGHTS RECOGNIZED IN *CHAMBERS V. MISSISSIPPI*, 410 U.S. 284 (1973)."

Taylor and Otis Allen ("Allen") offered testimony during the guilt phase of the trial that at approximately 4:00 a.m. on the morning of the murder, Birch approached Taylor and Allen and offered Taylor sex in exchange for crack cocaine or money (Dkt. 1 at p. 18).   Taylor proffered testimony from three of Birch's sisters that they saw Birch either purchase or use crack cocaine from 5 ½ months to 1 month before she was murdered (Id. at pp. 22-23).   The trial judge ruled that the sisters' testimony was irrelevant, and refused to allow the defense to present it to the jury.   Taylor argues that the trial court's refusal to allow the defense to introduce the sisters' testimony regarding Birch using crack cocaine prevented him from introducing evidence that corroborated his and Allen's testimony that Birch had offered Taylor sex in exchange for crack cocaine or money, and supported his defense of consent to the charges of sexual battery and felony murder.   In support of Ground Two, Taylor refers the Court to the United States Supreme Court's decision *Chambers v. Mississippi*, 410 U.S. 284 (1973).

16

Respondent acknowledges that this claim was raised in state court, but submits that in Taylor's initial brief to the Florida Supreme Court, he only "included two perfunctory citations to *Chambers*...," and his claim was based on state law (Dkt. 10 at p. 79).  Thus, Respondent argues that Ground Two is procedurally barred because Taylor did not fairly present his federal constitutional claim to the Florida Supreme Court.  The Court disagrees.

"[O]rdinarily[,] a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  "The exhaustion doctrine requires the petitioner to 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right."  *Cook v. McNeil*, 266 Fed. Appx. 843, 845 (11th Cir. 2008) (unpublished opinion) (citing *Duncan v. Henry*, 513 U.S. at 365-66 (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971))).  In his brief, Taylor cited to *Chambers*, and he argued in pertinent part that the exclusion of the victim's sisters' testimony that would have supported his defense of consent was in violation of his rights under the Sixth Amendment (Respondent's Ex. A-11 at pp. 54, 57).  The Court concludes that Taylor fairly presented his federal claim to the Florida Supreme Court.  Thus, he exhausted the claim he presents in Ground Two of the present petition.

Nevertheless, Taylor's claim is meritless because it challenges only a state court evidentiary ruling that does not rise to a denial of fundamental fairness..  In denying Taylor's claim, the Florida Supreme Court held:

Next, Taylor argues that the trial court erred in excluding testimony that the victim had been seen purchasing or using crack cocaine on various occasions before her death. Taylor proffered the testimony of three of the victim's sisters that they had seen her buy or use crack cocaine from five and one-half months to one month before her death. The trial court ruled that the testimony was irrelevant and refused to admit it.

Taylor's defense to the sexual battery charge was consent. He argues that the fact that Birch was a crack cocaine user was relevant to his defense because it corroborated his version of the events preceding the victim's death. Taylor argues that a crack cocaine user would be much more likely than a nonuser to approach a group of men at 4 a.m. in the location where this crime occurred and offer sex for money and drugs.

We find no error in the trial court's exclusion of this testimony.  A person seeking admission of testimony must show that it is relevant. *Stano v. State*, 473 So. 2d 1282, 1285 (Fla. 1985), *cert. denied*, 474 U.S. 1093, 106 S. Court. 869, 88 L. Ed. 2d 907 (1986). To be relevant, evidence must tend to prove or disprove a fact in issue. *Id*. The fact that the victim may have used or purchased crack cocaine on occasions prior to her death does not tend to show that she consented to sex with Taylor on the night in question. None of the witnesses whose testimony was excluded had observed the victim offer sex for drugs or money. Absent a link between the prior cocaine use and sexual activity by the victim, the testimony simply was not probative of whether she consented to sexual activity with Taylor before the fatal beating.

*Taylor v. State*, 583 So. 2d at 328.

Initially, federal habeas relief for a person in custody pursuant to the judgment of a state court is available only on the ground that the custody violates the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); *Jones v. Goodwin*, 982 F.2d 464, 471 (11th Cir. 1993); *Krasnow v. Navarro*, 909 F.2d 451, 452 (11th Cir. 1990). Whether the trial court erroneously excluded the victim's sisters' testimony is a matter of state law. A claim that a state trial court erred in admitting evidence under state laws or evidentiary rules provides no basis for federal habeas corpus relief because the claim presents no federal constitutional question. 28 U.S.C. § 2254(a); *Estelle v.*

*McGuire*, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The limitation on federal habeas review to claims of federal constitutional error applies with equal force when a petition, which actually involves state law issues, is couched in terms of a federal constitutional violation. *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Willeford v. Estelle*, 538 F.2d 1194, 1198 (5th Cir. 1976).

"However, when the...court's evidentiary rulings rise to the level of depriving the defendant of his constitutional right to present a defense, such rulings amount to constitutional error." *United States v. Perry*, 379 Fed. Appx. 888, 896 (11th Cir. Fla. 2010) (unpublished opinion).  The constitution irreducibly protects a criminal defendant's right to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). *See also, Chambers*, 410 U.S. at 302 ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").

Nonetheless, a federal court's inquiry into state evidentiary rulings is limited to violations of a federally guaranteed right, *Nordskog v. Wainwright*, 546 F.2d 69, 72 (5th Cir. 1977), such as the denial of fundamental fairness. *Hall v. Wainwright*, 733 F.2d 766, 770 (11th Cir. 1984). The category of infractions that violate fundamental fairness is narrow. *Estelle v. McGuire*, 502 U.S. at

19

73. Fundamental fairness is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor. *Boykins v. Wainwright*, 737 F.2d 1539, 1544 (11th Cir. 1984).

In this case, it cannot be said that the victim's sisters' proffered testimony was material in the sense of being crucial, critical, or highly significant.  Taylor and Allen were permitted to testify that the victim approached Taylor and offered him sex in exchange for money or crack cocaine (See e.g., Respondent's Ex. A-4 at pp. 442-44).  Adrian Mitchell testified that he saw Taylor and the victim walk off together, and that Taylor was not forcing the victim to leave with him (Respondent's Ex. A-4 at pp. 427-28, 430).  Taylor testified regarding the details of his sexual encounter with the victim, and that it was consensual (Id. at pp. 447-53).  Thus, Taylor was allowed to present evidence in support of his defense that the sexual encounter was consensual.

 Defense counsel proffered the testimony of the victim's sisters' to show that months prior to the murder, they had seen the victim purchase and/or use crack cocaine (Respondent's Ex. A-3 at pp. 363-64).  Defense counsel was not going to ask the sisters whether they had ever seen the victim offer sex for money or drugs; he was only going to ask them if they had seen the victim purchase or use crack cocaine (Id. at pp. 365-66).  The victim's sister Joyce Robinson testified that she saw the victim buy crack cocaine on one occasion, about one year prior to the trial (Id. at pp. 372-73).  She also testified, however, that she never saw the victim "offer her body for cocaine." (Id. at p. 373).  The victim's sister Alice Rose testified that she saw the victim use crack cocaine on one occasion, about ten months prior to the trial (Id. at p. 378).  She also testified, however, that she never saw the victim "offer to sell her body for rock cocaine."  (Id.).  Finally, the victim's sister Yvonee Robinson testified that she saw the victim use crack cocaine two or three times, and the last

20

time was about one month prior to her death (Id. at pp. 381-82).  She also testified, however, that she never saw the victim "trying to sell her body for crack."  (Id. at pp. 382-83).  The state trial court sustained the State's objection to the victim's sisters' testimony on the ground that it was irrelevant to Taylor's defense that the sex between Taylor and the victim was consensual (Id. at pp. 385, 367).

The Supreme Court has never "questioned the power of States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability-even if the defendant would prefer to see that evidence admitted." *Crane v. Ky.*, 476 U.S. 683, 690 (1986)(citing *Chambers*, 410 U.S. at 302).  Taylor has not shown that the victim's sisters' testimony that the victim used or purchased crack cocaine on a few occasions prior to her death tends to show that she consented to sex with him.  Exclusion of the victim's sisters' testimony did not fatally infect the trial so as to deprive Taylor of due process. Consequently, no constitutional violation occurred when the trial court excluded this testimony.

In sum, the exclusion of the victim's sisters' testimony did not affect the fundamental fairness of Taylor's trial.  Thus, the decision of the Florida Supreme Court was not contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, Ground Two does not warrant federal habeas relief.

**Ground Three**

"THE TRIAL COURT ERRED IN DENYING MR. TAYLOR'S MOTION FOR JUDGMENT OF ACQUITTAL, MADE AT THE CLOSE OF THE STATE'S CASE AND RENEWED AT THE CLOSE OF ALL THE EVIDENCE, BECAUSE THE STATE FAILED TO PROVE THAT THE KILLING WAS PREMEDITATED [AS TO THE ALLEGATION OF PREMEDITATED MURDER], AND ALSO FAILED TO PROVE THE ELEMENT OF LACK OF CONSENT [AS TO THE CHARGE OF SEXUAL BATTERY AND THE ALLEGATION OF FELONY MURDER]. THE STATE COURTS' DENIALS OF RELIEF RESULTED IN A DECISION THAT

WAS BASED ON AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED IN THE STATE COURT PROCEEDING."

In Ground Three, Taylor complains that the state trial court erred in denying his motions for judgment of acquittal because the State failed to prove both that the killing was premeditated, and the element of lack of consent as to the charge of sexual battery and allegation of felony murder.

Initially, this claim does not raise an issue of federal constitutional magnitude. Federal courts have jurisdiction to entertain petitions for habeas relief only from persons who are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims that are not based on a violation of the United States Constitution are not cognizable in a 28 U.S.C. § 2254 petition for writ of habeas corpus. *Barclay v. Florida*, 463 U.S. 939 (1983). Errors that do not infringe on federally protected rights provide no basis for federal habeas corpus relief.

Even if Taylor had framed this claim in the federal petition as a federal constitutional violation, which he did not, a federal claim was not exhausted in state court and is now procedurally barred. A review of the initial brief on direct appeal shows that Taylor relied only upon state statutory and case law in support of his argument on this issue (Respondent's Ex. A-11 at pp. 59-62). The basis of Taylor's argument was that there was no evidence of premeditation or absence of consent, as defined by Florida law (Id.). His failure to present federal constitutional argument in the state courts results in a procedural bar of this claim.

In *Pearson v. Sec'y, Dep't of Corr.*, 273 Fed. Appx. 847 (11th Cir. 2008) (unpublished), the Eleventh Circuit held that the petitioner's motion for judgment of acquittal, which was argued to the state court in terms of state law only, did not fairly present a federal constitutional claim, and was

therefore unexhausted and procedurally barred. The *Pearson* Court reiterated that in order to exhaust

constitutional claims, the petitioner must present his claims to the state courts in such a manner that

the state courts have an opportunity to apply controlling legal principles to the facts bearing upon

the petitioner's constitutional claim:

> The AEDPA requires a state prisoner to exhaust all available state court remedies, either on direct appeal or in a state postconviction proceeding, 28 U.S.C. § 2254(b)-©, thereby giving the state the opportunity to correct its alleged violations of federal rights, *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S.Ct. 1347, 1349, 158 L.Ed.2d 64 (2004). The exhaustion doctrine requires the petitioner to "fairly present" his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right. *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)). Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (citation omitted). The petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Id*. (quoting *Picard*, 404 U.S. at 277).

> "'Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'" *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007) (quoting *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (concluding that the issue was raised where the petitioner did not specifically state on direct appeal that these issues were to be reviewed under the Federal Constitution, but he provided enough information about the claims (including cites to Supreme Court cases) to notify the state courts that the challenges were being made on both state and federal grounds.). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Baldwin*, 541 U.S. at 32.

*Pearson*, 273 Fed. Appx. at 850.

Claims that are procedurally defaulted in state court are not reviewable by this Court unless the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent" contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Taylor has not demonstrated cause and prejudice or a miscarriage of justice to obtain federal review of the defaulted claim.

Accordingly, Ground Three does not warrant relief.

**Ground Four**

"THE TRIAL COURT ERRED IN EXCUSING FOR CAUSE A PROSPECTIVE JUROR WHO STATED THAT SHE DID NOT BELIEVE IN THE DEATH PENALTY, BUT THAT SHE PROBABLY COULD FOLLOW THE LAW."

In Ground Four, Taylor complains that his Sixth and Fourteenth Amendment rights were violated when, during the penalty phase retrial, the trial court excused prospective juror Arnaiz for cause. Taylor argues that a juror may not be excluded for cause because she is personally opposed to the death penalty, whether for religious, philosophical, political, or other reasons. Taylor asserts that although prospective juror Arnaiz initially indicated that her beliefs about the death penalty would prevent or impair her ability to serve as a juror, she ultimately indicated that "she probably could follow the law in weighing the aggravating and mitigating circumstances."

Taylor raised this claim on direct appeal of his resentencing (Respondent's Ex. B-7 at pgs. 65-70). In denying the claim, the Florida Supreme Court ruled as follows:

> Taylor next argues that prospective juror Arnaiz was improperly excused after stating her opposition to the death penalty. Prospective jurors may not be excused for cause simply because they voice general objections to the death penalty. *Witherspoon v.*

24

*Illinois*, 391 U.S. 510, 522, 88 S. Court. 1770, 20, 20 L. Ed. 2d 776 (1968).  The critical question is whether the prospective juror's views would prevent or substantially impair the performance of her duty under oath and in accordance with the judge's instructions. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Court. 844, 83 L. Ed. 2d 841 (1985).  A prospective juror's inability to be impartial about the death penalty need not be made "unmistakably clear." *Id*. at 425. "There will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . This is why deference must be paid to the trial judge who sees and hears the juror." *Sanchez-Velasco v. State*, 570 So. 2d 908, 915 (1990) (quoting *Wainwright v. Witt*, 469 U.S. at 424-26).  The trial judge's predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record, *Witt*, 469 U.S. at 429, and it is the trial judge's duty to decide if a challenge for cause is proper. *Id*. at 423.

Ms. Arnaiz's voir dire responses indicated that her feelings against the death penalty would impair her ability to serve as a juror in a capital case. Ms. Arnaiz asked to be heard privately and was questioned in camera about her beliefs and her ability to objectively follow the court's instructions. After encouragement by defense counsel, Ms. Arnaiz reluctantly agreed that she probably could follow the law despite her opposition to the death penalty. The trial judge found her answers conflicting and properly exercised the court's discretion in excusing Ms. Arnaiz.

*Taylor v. State*, 638 So. 2d 30, 32 (Fla. 1994).

In *Witherspoon*, the Supreme Court recognized that a juror who believes that capital punishment should never be inflicted and is irrevocably committed to its abolition could "nevertheless subordinate his personal views to what he perceived to be his duty to abide by his oath as a juror and to obey the law of the state." *Witherspoon*, 391 U.S. at 515 n.7. The holding in *Witherspoon* was, however, clarified in *Wainwright v. Witt*, 469 U.S. 412 (1985):

We therefore take this opportunity to clarify our decision in *Witherspoon*, and to reaffirm the above-quoted standard from *Adams*[8] as the proper standard for determining when a prospective juror may be excluded for cause because of his or her

---

[8]*Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 65 L. Ed. 2d 581 (1980).

views on capital punishment. That standard is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." We note that, in addition to dispensing with *Witherspoon*'s reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id*. at 424-26 (footnotes omitted). *Witt*, a case arising on federal habeas, is controlling precedent in

§ 2254 proceedings. *See Greene v. Georgia*, 519 U.S. 145, 146 (1996).

During voir dire, when the trial court asked preliminary questions of the jury venire, the court

asked:

So do any of you have a conscientious belief about the death penalty, whether it be based on moral, religious, social or other basis that you feel would prevent or substantially impair your ability to be a juror in this case where the death penalty is one of the sentences that may be imposed? And if you would just raise your hand I will identify you and then I will let the attorneys follow up on those questions.

(Respondent's Ex. B1 at pp. 19-20). In response, prospective juror Arnaiz raised her hand. (Id. at

p. 20).

The court's next question was:

If you were selected to be a juror in this case, would the view that you hold about the death penalty prevent or substantially impair your ability to act as an impartial juror in this case to the extent that you would be unable to render a true advisory opinion as to the sentence to be imposed in accordance with the facts, the instructions of law that will be given to you by this Court, and your sworn oath as a juror?

26

(Id. at pp. 20-21).  Prospective juror Arnaiz again indicated in the affirmative.  (Id. at p. 21).

During the prosecutor's questioning, the following pertinent exchange took place between the prosecutor and prospective juror Arnaiz:

Q. Would it be fair to say that you could not recommend the death penalty under any circumstances?

A. Well, not only that, just the case in all, it's hard to do.  I mean, you don't know anything about the case at all.

Q. And that's why the question has to revolve around your feelings about the death penalty.

A. Well, in my case it's doubtful.  I'm being honest.

(Id. at p. 64).

The following pertinent exchange took place between defense counsel and prospective juror Arnaiz:

Q. Are your feelings - - would you please tell me what your feelings are concerning capital punishment?

A. I just don't believe in it.  I'm sorry.

Q. You don't believe it in [sic]?

A. No.

Q. Under any circumstances?

A. Well, now your getting me in doubt.  It's been going around, so I don't know. I don't know.

Q. Well, let me ask it this way: Do you feel that could [sic] you follow the law concerning first degree murder in weighing the aggravating and mitigating circumstances here?

A. I probably could now, yes.

Q. You think you probably could?

A. I probably could.

Q. Don't let me put words in your mouth.

A. No. No. I'm not.

(Id. at pp. 124-25).

Over defense counsel's objection, the trial court granted that State's challenge for cause to prospective juror Arnaiz as follows:

> I'm going to grant the motion.  She further said she could not impose the death penalty under any circumstances. And then later she said she probably could.

(Id. at p. 139).

Prospective juror Arnaiz gave alternate views on her ability to apply the law properly. She indicated that she doubted she could recommended the death penalty under any circumstances, then she subsequently indicated that she probably could follow the law regarding weighing the aggravating and mitigating circumstances.  The trial court, who was in the best position to judge the jurors' demeanor, believed that prospective juror Arnaiz would not follow the law, and that her views would substantially impair the performance of her duties as a juror in the case.  This determination is supported by the record, and entitled to deference in this federal habeas proceeding. *See Witt*, 469 U.S. at 428.

28

Accordingly, Taylor is not entitled to habeas relief on Ground Four.

**Ground Five**

"THE TRIAL JUDGE ERRED IN FAILING TO CONDUCT AN INQUIRY AS TO THE STATE'S PEREMPTORY CHALLENGE OF A BLACK JUROR, BASED ON HER MISAPPREHENSION OF LAW THAT THE PRESENCE OF OTHER BLACKS ON THE PANEL NEGATED A SHOWING OF A LIKELIHOOD OF DISCRIMINATION."

In Ground Five, Taylor complains that during voir dire at the penalty phase retrial, the trial court erred in not requiring the prosecutor to articulate his reasons for striking a prospective black juror, Mr. Williams. Taylor asserts that after the prosecutor struck Mr. Williams, defense counsel objected and asked the trial court to require the prosecutor to state on the record the reasons for his challenge of Mr. Williams. He argues that "[a] *Batson* inquiry is required whenever a proper objection is made." (Dkt. 1 at p. 33).

Taylor raised this claim in his resentencing direct appeal to the Florida Supreme Court. In denying the claim, the Florida Supreme Court held:

> Taylor also contends that the court erred in not requiring a *Neil* FN2 inquiry when the State exercised a peremptory challenge of prospective juror Williams. Both Taylor and the victim in this case as well as Mr. Williams were black. Mr. Williams had earlier responded affirmatively when the prosecutor asked if any venirepersons had prior experience with law enforcement officers which would cause them to harbor ill feelings toward police. In addition, Mr. Williams had previously expressed some doubt to the court over whether he could concentrate on jury duty because he was holding two jobs and was worried about lost income. The prosecutor's challenge for cause based on Mr. Williams' employment concerns was denied. When the prosecutor later used a peremptory challenge to strike Mr. Williams, the defense objected and requested a *Neil* inquiry. The court noted that three black jurors had already been selected and found the defense's representation that the prosecution was excluding blacks to be unconvincing. At the time of this trial, Florida law required the party objecting to a peremptory challenge to make a prima facie showing of a "strong likelihood" of racial discrimination before there was a necessity of inquiring into the challenging party's motivation. *Neil*, 457 So. 2d at 486. FN3 In view of the

race-neutral reasons for excusal which were already on the record, the court did not err in declining to conduct a *Neil* inquiry.

FN2 *State v. Neil*, 457 So. 2d 481 (Fla. 1984).

FN3 In our recent opinion in *State v. Johans*, 613 So. 2d 1319 (Fla. 1993), we eliminated the requirement of making a prima facie showing of a strong likelihood of discrimination and held that henceforth a *Neil* inquiry must be initiated whenever such an objection is made.

*Taylor v. State*, 638 So. 2d at 32.

In *United States v. Allison*, 908 F.2d 1531 (11th Cir. 1990), the Eleventh Circuit Court of

Appeals held that:

it is not true that all peremptory strikes of black venirepersons are for racial reasons. In making out a *prima facie* case, the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal. The defendant must identify facts and circumstances that support the inference of discrimination, such as a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, or the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons

*Id*. at 1538 (internal citations and quotations omitted).  Only "[o]nce a prima facie case has been

established[] [does] the burden shift[] to the prosecutor to articulate a clear, reasonably specific and

neutral explanation for challenging the black jurors." *Id*. at 1536.

At trial, defense counsel did not present any evidence of a *Batson* violation with respect to

the prosecutor striking Mr. Williams (Respondent's Ex. B-1 at pp. 147-48).  Defense counsel "failed

to present evidence sufficient to raise an inference of purposeful discrimination." *Allison*, 908 F.

2d at 1537.  Thus, defense counsel did not establish a *prima facie* case of discrimination under

*Batson*.  Consequently, the prosecutor was not required to articulate reasons for challenging Mr.

Williams.  The fact that Mr. Williams was black and challenged by the prosecutor does not alone "establish an inference that the challenge[] [was] exercised with discriminatory animus."  *United States v. Pauleus*, 2011 U.S. App. LEXIS 3673, at *2 (11th Cir. Feb. 23, 2011) (unpublished opinion).  Taylor's argument that his constitutional rights were violated when the trial court denied his request for a *Batson* inquiry and refused to require the prosecutor to articulate his reasons for striking Mr. Williams is without merit.

Accordingly, this Court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on Ground Five.

## Ground Six

"MR. TAYLOR IS WRONGFULLY CONVICTED OF SEXUAL BATTERY, THE RESULT OF BRADY AND GIGLIO VIOLATIONS REVEALED BY THE MEDICAL EXAMINER AT THE EVIDENTIARY HEARING, AND INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. THE ERROR RESULTED IN WRONGFUL CONVICTION FOR FELONY MURDER AND A WRONGFUL FINDING OF THE AGGRAVATING FACTOR, HOMICIDE DURING COMMISION [sic] OF A RAPE."

In Ground Six, Taylor asserts that at the 1989 guilt phase trial, the State's medical examiner, Dr. Miller, who examined Birch's body after she died, denied that a kick could have caused the injuries to Birch's genital area.  Instead, Dr. Miller testified that the injuries were caused by insertion of a large object.  Taylor states that during the 1992 penalty phase retrial, Dr. Miller's opinion changed in that he testified that the perineal wounds could have been caused by a kick. Taylor next states that during the post-conviction evidentiary hearing, Dr. Miller's opinion shifted even further in that he stated all of the injuries to Birch's genital area could have been caused by a

kick.  Taylor asserts that injuries from a kick cannot support the sexual battery conviction, felony murder conviction, or the aggravating factor that the homicide was committed during the commission of a sexual battery.

Taylor also asserts that Dr. Miller concealed evidence of the presence of acid phosphatase in Birch's mouth, anus, and vagina.  Taylor states that a draft autopsy report indicated that levels of acid phosphatase were found in the victim's mouth, anus, and vagina.  Dr. Miller, however, altered the draft autopsy report so that the final autopsy report indicated that acid phosphatase levels were negative.  Taylor asserts that Dr. Miller's testimony at trial that he was unable to detect acid phosphatase was false.  Taylor contends that Dr. Miller's false testimony damaged his defense that the sexual intercourse was consensual because the level of acid phosphatase found in the victim was consistent with consensual sexual intercourse within 24 hours of the victim's death, and consistent with pre-ejaculate deposited in consensual sexual intercourse near the time of death.

Next, Taylor asserts that Dr. Miller inadequately preserved evidence of a bite mark on Birch's arm.  Specifically, Taylor complains that Dr. Miller failed to conduct a microscopic examination of the bite mark, failed to obtain a forensic odontolgist's report regarding the bite mark, and allowed the excised bite mark to be discarded after Taylor's trial.  Taylor claims that trial counsel was ineffective in failing to retain a pathologist to examine the bite mark evidence to establish when the bite mark was inflicted.

Finally, Taylor asserts Dr. Miller concealed that he had a subjective definition of "reasonable degree of medical probability."  Taylor states that during the post-conviction evidentiary hearing, Dr. Miller testified that when he used the term "reasonable degree of medical probability" during

his deposition and trial testimony, the term sometimes meant almost to a certainty, and other times meant better than 51 percent.   Taylor asserts that Dr. Miller never disclosed his definition of "reasonable degree of medical probability" to defense counsel.   Taylor states that Dr. Miller's definition of "reasonable degree of medical probability" differs from both the legal definition (Taylor does not state the "legal definition") and Dr. Wright's definition that he claims is the accepted standard in the profession (90 percent probability).

Taylor asserts that Dr. Miller misled the guilt phase jury, and the State knew or should have known of Dr. Miller's errors and corrected them. He argues that Dr. Miller has now recanted his testimony, which is the only evidence of sexual battery. Thus, Taylor asserts that Dr. Miller's allegedly false testimony at the guilt phase of the trial constitutes a violation of *Brady v. Maryland*, 373 U.S. 83 (1963)[9] and *Giglio v. United States*, 405 U.S. 150 (1972).[10] Taylor also avers that guilt phase trial counsel was ineffective in failing to consult with a forensic pathologist to develop evidence establishing that Taylor was not guilty of sexual battery, and corroborating that the sex was consensual.

Taylor raised his ineffective assistance of counsel claim in Claim V of his Fourth Amended Rule 3.850 motion (Respondent's Ex. E-14 at pp. 109-24).   Following an evidentiary hearing, the

---

[9]*Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.

[10]*Giglio* held that a defendant "must establish that the prosecutor 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony,' and that the falsehood was material." *Brown v. Head*, 272 F.3d 1308, 1317 (11th Cir. 2001) (citations omitted), *cert. denied*, 537 U.S. 978 (2002).

state post-conviction court denied the ineffective assistance of counsel claim stating, in pertinent part, as follows:

> Mr. Taylor alleges that trial counsel failed to investigate the facts surrounding the offense and the state's theory of the case, and unreasonably failed to present an adequate defense.

> \* \* \*

> Mr. Sinardi testified that he had no reason to believe Dr. Miller was not telling the truth in the autopsy report and he saw no reason to hire a medical examiner in light of the facts and the defense. Although the defense presented testimony from Dr. Wright in an attempt to show deficiencies in Dr. Miller's examination of the victim, the Court does not find that it has shown that Dr. Miller performed his medical examination in an incompetent manner. The Court notes that the testimony of Dr. Lynch substantially supported the findings of Dr. Miller. Although the defense tried hard to show some kind of deficiency in Mr. Sinardi's preparation and questioning regarding injury to the victim's vagina, both Dr. Miller and Dr. Lynch's testimony supported tears in the vaginal area caused by penetration. Mr. Sinardi testified that during the course of his representation of Mr. Taylor, he saw no reason to suspect he had competency issues. The Court finds that counsel made a reasoned strategic decision to have Mr. Taylor take the stand to humanize him to the jury. Mr. Sinardi testified it was part of the defense to show the defendants physical strength in contrast to the frail nature of the victim. He testified it was to show that Mr. Taylor was a big powerful man that became enraged and did not have the intent to kill the victim. The Court does not find any basis for Mr. Taylor's claims that defense counsel failed to pursue or convey a plea offer of life imprisonment, that witnesses were allowed to testify to inadmissible hearsay, and that counsel was ineffective in not assuring Mr. Taylor's jury consisted of a fair cross section of the community. The Court finds that any deficiencies that might have existed in counsel's representations of Mr. Taylor do not have the cumulative effect of denying him a fair trial.

> The Court finds defense claims of newly discovered evidence based on a supposed recantation by Dr. Miller of what caused the victim's vaginal injuries are not an accurate statement of his testimony. Dr. Miller concluded that the chances of the victim's vaginal injuries coming from a kick were kind of a one-in-a-million shot. The Court asked Dr. Miller if generally speaking the lacerations he found would involve penetration and he said that they would. Dr. Lynch testified that the injury to the vagina would indicate some sort of penetration that caused that injury.

The Court notes that Dr. Lynch testified that in her expert medical opinion something large was put into the vagina that caused the tearing and ripping and that she did not believe a kick caused the injury. The defense argues that the victim did not suffer a sexual battery by intrusion of an object penetrating the vagina and that her injuries were caused by being kicked. The Court finds the testimony of Dr. Lynch to be highly credible and agrees with her conclusion that there was penetration of the vagina and the damage to the vagina was not caused by a kick. The court finds that the evidence supports the finding of sexual battery and that trial counsel was not deficient in his defense of Mr. Taylor in this regard. Claim V of Defendant's Motion is denied.

(Respondent's Ex. E-5 at pp. 776-71).

Taylor raised his *Brady/Giglio* claim with respect to Dr. Miller's alleged false testimony regarding the presence of acid phosphatase in the victim in his Amendment and Supplement to Claim V of his Fourth Amended Rule 3.850 motion (Respondent's Ex. E-14 at pp. 187-95).  He raised his *Brady/Giglio* claims with respect to Dr. Miller's alleged false testimony regarding the cause of the victim's genital injuries, and Dr. Miller's subjective definition of "within a reasonable degree of medical probability" in Claim XXII of his Fourth Amended Rule 3.850 motion (Id. at pp. 196-207).  The state post-conviction court denied these claims as untimely pursuant to Florida Rules of Criminal Procedure, Rule 3.851(f)(4), which allows amendments up to 30 days prior to the evidentiary hearing, and because the claims were adequately raised in the existing pleadings (Respondent's Ex. E-5 at p. 787).

In affirming the denial of post-conviction relief, the Florida Supreme Court stated in pertinent part:

### DR. MILLER'S TESTIMONY

Taylor raised multiple claims concerning Dr. Miller's trial testimony concerning the extensive injuries suffered by the victim. The trial court addressed these claims

together, finding Taylor's allegations of recantation by Miller as to the victim's sexual injuries to be an inaccurate characterization of Miller's testimony. The trial court denied these claims, finding no newly discovered evidence, that trial counsel was not deficient, and that any possible deficiencies did not have the cumulative effect of denying Taylor a fair trial.

At trial, Dr. Miller testified that the injuries to the victim's vagina were, within a reasonable degree of medical probability, caused by something "inserted into the vagina which stretched the vagina enough for it to tear over the object that was inserted in there." Dr. Miller further testified that the injuries were inconsistent with someone having kicked the victim. Relying on this evidence, we noted on review that "the medical examiner's testimony contradicted Taylor's version of what happened . . . . The medical examiner testified that the extensive injuries to the interior and exterior of the victim's vagina were caused by a hand or object other than a penis inserted into the vagina." *Taylor*, 583 So. 2d at 329.

At the postconviction evidentiary hearing, Dr. Miller testified that the injuries sustained were mostly confined to the labia minora and radiated inward, while some were inside the labia minora in "what anyone would describe as the vaginal canal." However, Dr. Miller further testified that the injuries could possibly have been the result of a kick if the blow had been struck where the toe of the shoe actually went into the vagina, stretching it, that any shoe would have been able to penetrate the victim's vagina due to extraversion, but that ultimately the injuries were caused by stretching and not direct impact. Miller testified that the possibility of a kick causing the injury was "a one in a million shot" and that his opinions as expressed at trial had not changed. He attributed any differences in his testimony to differences in the questions being asked and, in some instances more elaboration in exploring possibilities. Taylor contends that had Miller's testimony about a kick possibly causing the vaginal injuries been presented at trial he could not have been convicted of sexual battery or felony murder. Taylor alleges that (1) this is new evidence that requires a new trial, (2) the State withheld this evidence, (3) the State allowed Dr. Miller to present false testimony, or (4) his trial counsel was deficient for not having discovered this evidence before trial.

**Newly Discovered Evidence**

In ruling on this issue, the trial court found Taylor's claim of a "supposed recantation" by Dr. Miller of his trial testimony was "not an accurate statement of [Dr. Miller's] testimony." Hence, the trial court concluded Taylor had not actually established the existence of important new evidence of his innocence of sexual battery. We agree.

36

To obtain a new trial based on newly discovered evidence, Taylor must meet two requirements: first, the evidence must be newly discovered and not have been known by the party or counsel at the time of trial, and the defendant or defense counsel could not have known of it by the use of diligence; second, the newly discovered evidence must be of such quality and nature that it would probably produce an acquittal on retrial. *See Jones v. State*, 709 So. 2d 512, 521 (Fla. 1998) (citing *Jones v. State*, 591 So. 2d 911, 915 (Fla. 1991)). In determining whether the evidence compels a new trial, the trial court must "consider all newly discovered evidence which would be admissible," and must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." *Jones*, 591 So. 2d at 916. This determination includes

> whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevancy of the evidence and any inconsistencies in the newly discovered evidence.

*Jones*, 709 So. 2d at 521 (citations omitted). As noted above, the second prong of *Jones* requires a showing of the probability of an acquittal on retrial.

On review, "[t]his Court does not substitute its judgment for that of the trial court on issues of fact when competent, substantial evidence supports the circuit court's factual findings." *Smith v. State*, 931 So. 2d 790, 803 (Fla. 2006) (citing *Windom v. State*, 886 So. 2d 915, 921 (Fla. 2004)); *see also Blanco v State*, 702 So. 2d 1250, 1252 (Fla. 1997) (citing *Demps v. State*, 462 So. 2d 1074, 1075 (Fla. 1984)). In essence, the postconviction court concluded that, at trial, Dr. Miller testified that the lacerations were not, within reasonable medical probability, caused by a kick. Similarly, at the evidentiary hearing, Dr. Miller testified that it was his opinion that there was only a one-in-a-million chance that the lacerations could have been caused by a kick. Hence, because the record refutes Taylor's contrary interpretation of the testimony, Taylor fails to show that Miller's postconviction testimony qualifies as newly discovered evidence. While it is true that Miller's trial testimony did not admit to this one-in-a-million possibility, we find this omission insufficient to overturn the trial court's conclusion that sufficient "new evidence" had not been established.

Additionally, we note the jury was not instructed to and did not differentiate between first-degree premeditated murder and first-degree felony murder in determining Taylor's guilt. There is no indication that Taylor was convicted of first-degree murder predicated solely upon the felony of sexual battery. This Court previously detailed the

massive injuries sustained by the victim to support the State's alternative theories of premeditation and felony murder:

> [T]he jury reasonably could have rejected as untruthful Taylor's testimony that he beat the victim in a rage after she injured him. Although Taylor claimed that the victim bit his penis, an examination did not reveal injuries consistent with a bite. According to Taylor, even after he sufficiently incapacitated the victim by choking her so that she released her bite on him, he continued to beat and kick her. The medical examiner testified that the victim sustained a minimum of ten massive blows to her head, neck, chest, and abdomen. Virtually all of her internal organs were damaged. Her brain was bleeding. Her larynx was fractured. Her heart was torn. Her liver was reduced to pulp. Her kidneys and intestines were torn from their attachments. Her lungs were bruised and torn. Nearly all of the ribs on both sides were broken. Her spleen was torn. She had a bite mark on her arm and patches of her hair were torn off. Her face, chest, and stomach were scraped and bruised. Although Taylor denied dragging the victim, evidence showed that she had been dragged from one end of the dugout to the other. The evidence was sufficient to submit the question of premeditation to the jury.

*Taylor*, 583 So. 2d at 329.

Accordingly, even if Dr. Miller's alleged change in testimony were considered sufficient to call into question Taylor's sexual battery conviction, it would not be sufficient to outweigh the evidence that Taylor committed premeditated murder or to cast doubt on his conviction for first-degree murder based upon premeditation. Ultimately, then, even if we were to construe Dr. Miller's testimony at the evidentiary hearing the way Taylor seeks, there remains an abundance of evidence the jury could have used to convict Taylor of premeditated first-degree murder. Hence, we conclude the trial court did not err in denying this claim.

### Giglio/Brady

In addition to the claim of newly discovered evidence arising from Dr. Miller's testimony, Taylor asserts that the trial court erred in denying his claim that through Miller's testimony the State intentionally permitted false or misleading evidence to be presented to the jury in violation of *Giglio* (where the United States Supreme Court held it to be a violation of due process when a prosecutor failed to disclose to the defense a promise made by the prosecution to a key witness that he would not be

prosecuted if he testified for the prosecution). Finding there was no change in Dr. Miller's testimony, the trial court denied this claim. We conclude that the trial court properly denied Taylor's claim because it is refuted by the record.

To prevail under *Giglio*, a claimant must show that false testimony was presented by the State and that there is a reasonable possibility that the false evidence affected the judgment of the jury. *See Ventura v. State*, 794 So. 2d 553, 564-65 (Fla. 2001) (holding that a witness's testimony was not material under *Giglio* where the witness was significantly impeached); *Routly v. State*, 590 So. 2d 397, 400-01 (Fla. 1991) (finding that an equivocal statement did not have a reasonable probability of affecting the judgment of the jury).

Taylor alleges that Dr. Miller's trial testimony was false because it was contradicted by his testimony at the evidentiary hearing. As the trial court concluded, the record does not support this allegation. Dr. Miller's testimony did not materially change. When the trial court finds that the testimony is not false, and there is competent substantial evidence to support that finding, we defer to the trial court's findings. Accordingly, Taylor has not shown cause for relief under *Giglio*.

Alternatively, Taylor asserts that the State withheld material, favorable information in violation of *Brady*. Brady requires the State to disclose material information within its possession or control that is favorable to the defense. *Mordenti v. State*, 894 So. 2d 161, 168 (Fla. 2004) (citing *Guzman v. State*, 868 So. 2d 498, 508 (Fla. 2003)). To establish a *Brady* violation, the defendant has the burden to show (1) that favorable evidence, (2) was willfully or inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced. *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Court. 1936, 144 L. Ed. 2d 286 (1999); *Cardona v. State*, 826 So. 2d 968, 973 (Fla. 2002 ); *Way v. State*, 760 So. 2d 903, 910 (Fla. 2000). The remedy of retrial for the State's suppression of evidence favorable to the defense is available when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290 (quoting *Kyles v. Whitley*, 514 U.S. 419, 435, 115 S. Court. 1555, 131 L. Ed. 2d 490 (1995)).

Here, however, the trial court has concluded, and we agree, that neither the State nor its actors suppressed evidence. Because the trial court has concluded that Dr. Miller's testimony is unchanged, there is nothing the State has been demonstrated to have suppressed.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Taylor raised multiple claims of ineffective assistance of defense counsel stemming from his representation at trial and both penalty phases. Taylor also alleged ineffective assistance in the alternative should the court determine any of his other claims insufficient for lack of due diligence by counsel. In addressing these claims, the trial court found that Taylor failed to demonstrate deficiency or any resulting prejudice, the two prongs of *Strickland v. Washington*, 466 U.S. 668, 104 S. Court. 2052, 80 L. Ed. 2d 674 (1984). We agree.

We have held that for ineffective assistance of counsel claims to be successful, the two requirements of *Strickland* must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

*Maxwell v. Wainwright*, 490 So. 2d 927, 932 (Fla. 1986) (citations omitted). To prove the deficiency prong under *Strickland*, Taylor must prove that counsel's performance was unreasonable under the "prevailing professional norms." *Morris v. State*, 931 So. 2d 821, 828 (Fla. 2006) (quoting *Strickland*, 466 U.S. at 688). "To establish the [prejudice] prong under *Strickland*, the defendant must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694).

## Failure to Perform Due Diligence

Taylor asserts this ineffectiveness argument in the alternative for his newly discovered evidence claims relating to Dr. Miller's testimony. Taylor alleges that should this Court find that any evidence could have been discovered at trial, then trial counsel was deficient for failure to discover said evidence. As discussed  above with Dr. Miller's testimony, and below with Taylor's other claims, we conclude there was no material new evidence presented during these proceedings. Further, unlike the situation in *State v. Gunsby*, 670 So. 2d 920 (Fla. 1996), upon which Taylor relies, the

40

State has not been shown to have withheld evidence, and trial counsel has not been found to have failed to object to abuses by the State. *See id.* at 922-24. Each of Taylor's claims of newly discovered evidence is sufficiently refuted by the trial and postconviction record. None of them fail for counsel's lack of diligence. For example, we find there has been no demonstration of ineffectiveness under *Strickland* as to counsel's alleged failure to elicit Dr. Miller's "one in a million" testimony at trial. Accordingly, we reject Taylor's claim that counsel's performance was deficient.

*Taylor v. State*, 3 So. 3d at 992-96.

Initially, the Court notes that the state post-conviction court declined to review Taylor's *Brady/Giglio* claims, in part, because they were untimely (Respondent's Ex. E-5 at p. 787). The Florida Supreme Court addressed on the merits Taylor's *Brady/Giglio* claim with respect to Taylor's assertion that Dr. Miller's testimony that the victim's genital injuries could not have been caused by a kick was false, but did not mention in its opinion any *Brady/Giglio* issue involving Dr. Miller's testimony regarding acid phosphatase or his "subjective" definition of "within a reasonable degree of medical probability." *See Taylor v. State*, 3 So. 3d 986. Thus, it would appear that Taylor's *Brady/Giglio* issues involving Dr. Miller's testimony regarding acid phosphatase or subjective definition of "within a reasonable degree of medical probability" are procedurally defaulted. Nevertheless, it appears Respondent has waived the procedural bar defense by failing to assert it in the response. *See Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1340 (11th Cir. 2009) ("If, on the other hand, the petitioner did raise the claim in the state courts but not at the time or in the manner required by state procedural rules, the resulting procedural bar defense may be waived by the State's failure to assert it.") (citing *McNair v. Campbell*, 416 F.3d 1291, 1306 (11th Cir. 2005) (a procedural bar that arises from the failure to bring a claim in state court "is to be distinguished from one that

arises, not because of a failure to exhaust, but rather because the state court will not hear the claim due to a state procedural bar")).

In *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740 (11th Cir. 2010), the Eleventh Circuit Court of Appeals stated:

> A *Brady* violation has three components: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999). The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985) (quotation marks omitted); *see also Kyles v. Whitley*, 514 U.S. 419, 433, 115 S.Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995). Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict. *See Kyles*, 514 U.S. at 434, 436-37 & n.10, 115 S.Ct. at 1566-67 & n.10; *see also Hammond*, 586 F.3d at 1305-06; *Smith*, 572 F.3d at 1334.

*Id*. at pp. 745-46.

At the guilt phase trial, Dr. Miller testified that within a reasonable degree of medical probability the injuries to the interior of the victim's vagina were caused by "[s]omething...inserted into the vagina which stretched the vagina enough for it to tear over the object that was inserted in there." (Respondent's Ex. A-1 at p. 82). Dr. Miller also testified that the injury to the exterior of the victim's vagina was also consistent with penetration of the vagina by an object (Id. at pp. 82-87). Dr. Miller further testified that within a reasonable degree of medical probability the injuries to both the interior and exterior of the victim's vagina were not consistent with having been inflicted by someone kicking the victim in that area (Id. at p. 87). On cross-examination, Dr. Miller testified in pertinent part that within a reasonable degree of medical certainty he could not state whether the

injuries to the exterior of the victim's vagina were caused by blows or not, but he could state that the injuries were probably not caused by blows striking the area (Id. at pp. 98-99).

Taylor asserts that Dr. Miller's testimony changed during the 1992 penalty phase retrial when he testified that the injuries to the exterior of the victim's vagina could have been caused by a kick. At the penalty phase retrial, Dr. Miller testified in pertinent part that he could not, within a reasonable degree of medical certainty, exclude that the injuries to the exterior of the victim's vagina were caused by a kick (Respondent's Ex. B-2 at pp. 321-22). That testimony, however, is not inconsistent with his trial testimony that he could not state whether the injuries to the exterior of the victim's vagina were caused by blows or not, but he could state that the injuries were probably not caused by blows striking the area (Respondent's Ex. A-1 at pp. 98-99).

Taylor also asserts that Dr. Miller's 1992 testimony, that the injuries to the exterior of the victim's vagina were not typical of an insertion injury, was directly contrary to his 1989 testimony that, to a reasonable degree of medical probability, the injuries to the interior and exterior of the victim's vagina were all caused by stretching from insertion of a large object. During trial, Dr. Miller did testify that within a reasonable degree of medical probability the interior injuries were caused by something inserted into the vagina (Respondent's Ex. A-1 at p. 82). He did not, however, testify that within a reasonable degree of medical probability the exterior injuries were *caused* by something inserted into the vagina. Instead, he testified that within a reasonable degree of medical probability the injury to the exterior of the vagina was *consistent* with penetration of the vagina by an object (Id. at pp. 82-83). Dr. Miller then explained how both the interior and exterior injuries "can be produced by the same object or force that stretches the vagina." (Id. at pp. 86-87). Dr.

43

Miller's 1989 testimony that the injury to the exterior of the vagina was consistent with penetration of the vagina by an object, is not inconsistent with his 1992 testimony that he was "not really sure how that larger tear on the outside was sustained" and that it was "not really typical of something large being inserted into the vagina, although that is a possibility."  (Respondent's Ex. B-2 at p. 313).

Taylor opines that Dr. Miller's opinion further changed during the 2004 evidentiary hearing in that he recanted his trial testimony that the injuries to the victim's vagina were caused by penetration with a large object (see Dkt. 1 at p. 58).  Taylor's assertion that Dr. Miller recanted his trial testimony regarding penetration by a large object is a mischaracterization of Dr. Miller's testimony during the evidentiary hearing.  During the evidentiary hearing, Dr. Miller did testify in pertinent part that "I agree that if a blow had been struck where the toe of the shoe actually went, went into the vagina stretching the vagina it would have introduced the injuries that I've described." (Respondent's Ex. E-12 at p. 1950).  He also testified that the injuries "could have been [caused by] a hard blow from a shoe going directly in.  That didn't come up [at trial] and it certainly seems a reasonable possibility, maybe even a probability, in reading Dr. Wright's testimony."  (Id.). However, when asked whether his testimony at the evidentiary hearing "would be that the injuries to the ten radial lacerations in the labia minora to a reasonable degree of medical probability are the result of a kick?" Dr. Miller responded "that they could have been the result of a kick."  (Id.).  He also stated that "the shoe or the foot actually entering the vaginal canal...was...a one-in-a-million shot."  (Id. at pp. 1950-51).  Further, he testified that his opinion that the injuries to the interior of the victim's vagina were caused by penetration of a large object had not changed, and he did not

know what the large object was that caused the injuries (Id. at p. 1975).  Dr. Miller's testimony at the 2004 evidentiary hearing is not inconsistent with his 1989 trial testimony. He still held the opinion that the injuries to the interior of the victim's vagina were caused by penetration of a large object.  Dr. Miller did not testify at the evidentiary hearing that it was his opinion within a reasonable degree of medical probability that the injuries to the victim's genital area were caused by a kick.  Instead, he stated that the injuries possibly could have been caused by a kick if the shoe had actually entered the vaginal canal, which he stated was "a one-in-a-million shot."  That testimony is not inconsistent with his trial testimony that within a reasonable degree of medical probability the interior injuries were caused by something inserted into the vagina, and that those injuries were not consistent with having been inflicted by someone kicking the victim in that area.

The state courts' finding that neither the State nor its actors suppressed evidence is a factual finding, and this Court must defer to factual findings of the state court, as Taylor does not overcome the presumption of correctness of the state courts' findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Thus, Taylor's *Brady* claim fails because the State did not suppress evidence.

Taylor has failed to demonstrate that the state courts' denial of his *Brady* claim that Dr. Miller concealed evidence that a kick could have caused the injuries to the victim's genitals was contrary to or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts.

Just as there is no *Brady* violation, there is no *Giglio* violation.  "To make out a valid *Giglio* claim, a petitioner must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material — i.e.,

that there is any reasonable likelihood that the false testimony could have affected the judgment."

*Ferguson v. Sec'y for the Dep't of Corr.*, 580 F.3d 1183, 1208 (11th Cir. 2009) (quotation marks, alterations, and citation omitted).  Taylor alleges that Dr. Miller's trial testimony was false because it was contradicted by his testimony at the evidentiary hearing. The state courts' found that Dr. Miller's testimony did not materially change.  This factual finding is supported by the record. Taylor does not overcome the presumption of correctness of the state court's findings by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Thus, Taylor's *Giglio* claim fails because Taylor does not establish the Dr. Miller presented any false testimony regarding the injuries to the victim's genitals.

Taylor has failed to demonstrate that the state courts' denial of this *Giglio* claim was contrary to or an unreasonable application of clearly established federal law, or that it was based on an unreasonable determination of the facts.

Taylor also raises a *Giglio* claim with respect to Dr. Miller's testimony at the evidentiary hearing regarding his definition of "reasonable degree of medical probability."  During the June 7, 2004 evidentiary hearing, the following colloquy took place:

> Q. When you use probably and reasonable degree of medical probability, you said in your deposition last year that you mean to an almost certainty.
>
> A. That's probably, that's probably true.  When I use the term probably, it's much better than 51 percent, which I'm told is the legal term for probably.  I don't use probably if I think something's a coin flip.  I have to be pretty sure.
> Q. Do you tell attorneys - -
>
> A. Close to certainty I would say.

Q. Do you tell attorneys that your standard differs from theirs when they ask you about a different degree of pathological probability?

A. Yes.

Q. Do they have to ask or do you just volunteer?

A. Sometimes I - - sometimes it just, it just comes out.  I don't know. It's come up dozens and dozens of times and everybody disagrees on that point.  And so I usually try and make it clear, but I can't guarantee that.

Q. So every time you gave testimony in deposition or trial in this case when you used a reasonable degree of medical probability you meant almost to a certainty; is that correct?

A. It depends. Sometimes it's better than 51 percent, sometimes it's almost to a certainty. I can't delineate it. It's better than a coin flip, but it's not a certainty. There's a gray area there that I use that it's happened a million times some attorney attempts to be very precise about it. I just can't do it.

Q. But, so you're saying that when you use that term sometimes you use a lower standard and sometimes you use the almost certain standard?

A. Exactly.

Q. And you have explained that when you -- which standard you're using when you give that testimony?

A. It depends how closely I'm questioned. I usually say it's a gray area and I can't give you an absolute percentage. Sometimes I think things are more probable than other times. Probable gives you a little room to wiggle I think.

(Respondent's Ex. E-12 at pp. 1944-45).

Taylor fails to demonstrate a *Giglio* violation. Taylor admits that during the 1989 trial, Dr.

Miller was not asked to give a definition of "within a reasonable degree of medical probability."

Nor has Taylor established that there is a generally accepted legal definition of "within a reasonable

degree of medical probability" that was applicable to Taylor's case.  Although Dr. Wright testified

47

that the standard he uses as a professor of forensic pathology is "90 percent or better," he admitted that "some people use 51 percent as the test for reasonable medical probability." (Respondent's Ex. E-10 at p. 1536). When the prosecutor, Mr. Benito, was asked during the evidentiary hearing whether a reasonable degree of medical probability means 51 percent, he answered that he "couldn't quantify it." (Respondent's Ex. E-4 at pp. 574-75). When asked the same question, defense counsel, Mr. Sinardi, testified that "I don't know if it's quantifiable. I'm not aware of it ever being quantifiable." (Id. at pp. 630-31). Taylor fails to demonstrate that Dr. Miller presented false testimony at trial when he used the term "within a reasonable degree of medical probability."

Finally, Taylor raises one more *Giglio* claim, i.e., Dr. Miller's trial testimony that he was unable to detect acid phosphatase or spermatozoa in the victim's mouth, vagina, or anus is false.

At the 1989 trial, Dr. Miller testified that during the autopsy he collected certain bodily fluids from the victim (Respondent's Ex. A-1 at p. 103). He stated that the purpose of collecting fluids from the victim's mouth, anus, and vagina was to detect the presence of semen (Id.). He tested the fluids for the presence of acid phosphatase and spermatozoa, both components of semen (Id. at p. 104). When asked "what is your opinion within a reasonable degree of medical probability as to the presence of either acid phosphatase or spermatozoa..." he answered "I was able to detect neither acid phosphatase or spermatozoa in the material from the mouth of [sic] the vagina or anus." (Id.).

Dr. Miller's final autopsy report indicated that oral, vaginal, and anal acid phosphatase was "negative." (Respondent's Ex. E-14 at p. 46). The report also indicated that oral, vaginal, and anal spermatozoa was "negative." (Id.). His prior draft autopsy report, however, indicated that oral acid phosphatase was "198 u/l"; rectal acid phosphatase was "66 u/l"; and vaginal acid phosphatase was

"264 u/l." (Id. at p. 53).  Those lab results were crossed out, and written notes were made indicating acid phosphatase was negative (Id.).

During the June 7, 2004 evidentiary hearing, Dr. Miller testified that he had crossed out the acid phosphatase results in the draft lab report, and wrote on the draft lab report that the results should state negative (Respondent's Ex. E-12 at pp. 1922-23).  Dr. Miller also testified that even though he changed the report to indicate that the acid phosphatase results were negative, that did not mean that there was absolutely no acid phosphatase present in the fluid samples (Id. at p. 1959).  He also testified, however, that

> There's a wide range of acid phosphatase.  And from zero to 300 (UL or units per liter) or about 300 is considered negative.  From 300 to 2,000 is considered equivocal, maybe yes/maybe no, with of course the probability going up the higher the level is.  And only after a level of 3,000 is reached is it adjudged that semen is definitely present.

(Id. at p. 1960).  He also testified that "the levels here are the levels for this lab (that performed the test on the victim's fluids)."  (Id.).

Dr. Miller explained that when he was asked in his deposition whether there had been any acid phosphatase, he believed that he was being asked whether "seminal acid phosphatase" was present (Id. at p. 1965).  He elaborated that test results never show "an acid phosphatase [level] of zero."  (Id.).  "[T]here's always acid phosphatase found."  (Id.).  At levels below 300, "you're going to always find it in anyone, even decomposed bodies."  (Id. at p. 1972).  He stated that he believed attorneys knew that when he says negative for acid phosphatase, he meant below a certain threshold (Id. at p. 1966).  He had explained the difference between a negative and zero acid phosphatase level to attorneys many times (Id.).  He also stated that the attorneys he worked with in Taylor's case had

worked with him many times before, and they understood that low levels of acid phosphatase meant negative (Id. at p. 1967).

Dr. Wright testified that if he were asked at the 1989 trial whether acid phosphatase was present, he would have stated that it was present (Respondent's Ex. E-10 at pp. 1550-52).  He testified that Dr. Miller's statement at trial that he was unable to detect acid phosphatase was "an untruth."  (Id. at p. 1552).  Dr. Wright also stated, however, that the lab result for acid phosphatase "was equivocal.  It's present but it's not - - it's at a level which is difficult to interpret.  It could indicate recent coitus or alternatively none."

Taylor fails to demonstrate a *Giglio* violation.  First, Dr. Miller's testimony does not appear to be false.  Although the lab result indicated the presence of acid phosphatase, Dr. Miller testified that he was "examining for the presence of semen."  (Respondent's Ex. A-1 at p. 103).  He testified at the evidentiary hearing that acid phosphatase levels below 300, for the lab that performed the lab test, is considered negative for the presence of semen (Respondent's Ex. E-12 at p. 1960).  He testified that all lab tests for acid phosphatase will indicate the presence of some level of acid phosphatase (Id. at p. 1972).  He believed that the attorneys he worked with in Taylor's case understood that "negative" did not mean that there was zero acid phosphatase (Respondent's Ex. E-12 at pp. 1966-67).  Dr. Wright testified that the acid phosphatase results were "equivocal," "difficult to interpret," and "could either indicate recent coitus or alternatively none." (Respondent's Ex. E-10 at p. 1551).  Although if may be correct to say that Dr. Miller made an erroneous statement that he "was able to detect neither acid phosphatase or spermatozoa in the [fluids from the victim]," in light of the record, it is incorrect to say that he knowingly gave false

50

testimony.  *Cf. United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010) ("To establish prosecutorial misconduct for the use of false testimony" false testimony must be given with "willful intent" and "not as a result of mistake, confusion, or faulty memory.") (citation omitted).  While Dr. Miller's testimony may have given the impression that zero acid phosphatase was detected, there is no indication that Dr. Miller willfully intended to mislead the jury.

Moreover, Taylor has not established that the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony.  *Ferguson*, 580 F.3d at 1208.  The prosecutor, Mr. Benito, testified at the evidentiary hearing that he had no recollection of Dr. Miller ever mentioning the actual lab results for acid phosphatase to him, or asking him about the results (Respondent's Ex. E-4 at pp. 571-72).  Nor did he have any recollection of seeing the lab test results (Id. at p. 572).  Mr. Benito testified that unless Dr. Miller said otherwise, a lab test result that said "negative" for the presence of acid phosphatase meant to him that there was "zero" acid phosphatase present (Id. at p. 574).  In light of the record before this Court, there is no testimony or any other competent substantial evidence introduced that would support a finding that the prosecutor knew that any false testimony of Dr. Miller was submitted to the jury.

Further, even if Dr. Miller testified falsely as to the acid phosphatase results, Taylor does not establish that Dr. Miller's knowledge should be imputed to the prosecutor.  *See Smith v. Massey*, 235 F. 3d 1259, 1272 (10th Cir. 2000) ("Supreme Court precedent does not clearly establish that [State's expert chemist's] knowledge should be imputed to the prosecution..."). *See also Sargent v. McNeil*, 2011 U.S. Dist. LEXIS 49925, at *23 (N.D. Fla. May 10, 2011) ("Supreme Court holdings have

never imputed knowledge of false testimony to the prosecutor from state expert witnesses or even police officers.") (citation omitted).

Finally, Taylor has not shown that Dr. Miller's testimony that he did not detect acid phosphatase in the victim's cavaties "had substantial and injurious effect or influence in determining the jury's verdict." *See Ventura v. AG*, 419 F.3d 1269, 1279 n. 4 (11th Cir. 2005) (although *Giglio*'s "any reasonable likelihood" standard is equivalent to the *Chapman v. California*, 386 U.S. 18, 24 (1967) "harmless beyond a reasonable doubt" standard, the *Brecht* standard that error "had substantial and injurious effect or influence in determining the jury's verdict" applies to *Giglio* claims on federal habeas review).  Dr. Miller testified that the levels of acid phosphatase found in the victim were so low that they were considered "negative."  He testified that lab tests will always reveal some level of acid phosphatase.  Taylor argues that the lab test results would have supported his "consensual sex defense."  However, Dr. Wright testified that the lab results were "equivocal" and "difficult to interpret," and could have indicated either "coitus or alternatively none."  Defense counsel admitted that the lab test results would have tended to confirm an allegation of consensual or non-consensual sex (Respondent's Ex. E-4 at p. 687).  Thus, although the lab results may have been consistent with consensual sex, they were equally consistent with non-consensual sex, or no sex at all.  Therefore, Taylor's *Brady/Giglio* claims do no warrant federal habeas relief.

Taylor also raises an ineffective assistance of counsel claim, asserting 1989 defense counsel, Mr. Sinardi, rendered deficient performance in failing to seek appointment of an independent pathologist to assist in the defense.  Specifically, it appears Taylor first asserts that an independent pathologist would have established that the victim did not suffer a battery by intrusion of an object,

52

but instead would have established that the injuries to her genital area were caused by a kick (Dkt. 1 at pp. 53-54).  Taylor states that Dr. Wright's testimony at the evidentiary hearing that the injuries to the victim's genital area were caused by a kick completely exonerates Taylor of the sexual battery charge.  Taylor also asserts that counsel was ineffective at the 1989 trial in failing to elicit from Dr. Miller the testimony Dr. Miller gave during the evidentiary hearing regarding the cause of the injuries to the victim's genital area (Id. at p. 56).

Again, in denying this claim, the state post-conviction court stated in pertinent part:

Mr. Sinardi testified that he had no reason to believe Dr. Miller was not telling the truth in the autopsy report and he saw no reason to hire a medical examiner in light of the facts and the defense. Although the defense presented testimony from Dr. Wright in an attempt to show deficiencies in Dr. Miller's examination of the victim, the Court does not find that it has shown that Dr. Miller performed his medical examination in an incompetent manner. The Court notes that the testimony of Dr. Lynch substantially supported the findings of Dr. Miller. Although the defense tried hard to show some kind of deficiency in Mr. Sinardi's preparation and questioning regarding injury to the victim's vagina, both Dr. Miller and Dr. Lynch's testimony supported tears in the vaginal area caused by penetration.

* * *

The Court finds defense claims of newly discovered evidence based on a supposed recantation by Dr. Miller of what caused the victim's vaginal injuries are not an accurate statement of his testimony. Dr. Miller concluded that the chances of the victim's vaginal injuries coming from a kick were kind of a one-in-a-million shot. The Court asked Dr. Miller if generally speaking the lacerations he found would involve penetration and he said that they would. Dr. Lynch testified that the injury to the vagina would indicate some sort of penetration that caused that injury.

The Court notes that Dr. Lynch testified that in her expert medical opinion something large was put into the vagina that caused the tearing and ripping and that she did not believe a kick caused the injury. The defense argues that the victim did not suffer a sexual battery by intrusion of an object penetrating the vagina and that her injuries were caused by being kicked. The Court finds the testimony of Dr. Lynch to be highly credible and agrees with her conclusion that there was penetration of the

53

vagina and the damage to the vagina was not caused by a kick. The court finds that the evidence supports the finding of sexual battery and that trial counsel was not deficient in his defense of Mr. Taylor in this regard. Claim V of Defendant's Motion is denied.

(Respondent's Ex. E-5 at pp. 769-71).

In affirming the denial of this claim, the Florida Supreme Court stated:

Taylor asserts this ineffectiveness argument in the alternative for his newly discovered evidence claims relating to Dr. Miller's testimony. Taylor alleges that should this Court find that any evidence could have been discovered at trial, then trial counsel was deficient for failure to discover said evidence. As discussed  above with Dr. Miller's testimony, and below with Taylor's other claims, we conclude there was no material new evidence presented during these proceedings. Further, unlike the situation in *State v. Gunsby*, 670 So. 2d 920 (Fla. 1996), upon which Taylor relies, the State has not been shown to have withheld evidence, and trial counsel has not been found to have failed to object to abuses by the State. *See id.* at 922-24. Each of Taylor's claims of newly discovered evidence is sufficiently refuted by the trial and postconviction record. None of them fail for counsel's lack of diligence. For example, we find there has been no demonstration of ineffectiveness under *Strickland* as to counsel's alleged failure to elicit Dr. Miller's "one in a million" testimony at trial. Accordingly, we reject Taylor's claim that counsel's performance was deficient.

*Taylor v. State*, 3 So. 3d at 992-96.

During the post-conviction hearing, defense counsel, Mr. Sinardi, testified that he had worked with Dr. Miller in the past, and found him to be thorough and professional in his autopsy reports (Respondent's Ex. E-4 at pp. 679-80).  He had no reason to doubt anything Dr. Miller said in the autopsy report (Id. at p. 680).  In light of the facts of the case and the defense, Mr. Sinardi did not see any reason to hire an independent medical examiner (Id.).  Mr. Sinardi testified that it was important to maintain credibility with the jury, and it was his practice to focus on one theory of defense instead of attempting to assert a variety of alternative theories of defense (Id. at p. 681).

54

Further, at the 1989 trial, Mr. Sinardi rigorously cross examined Dr. Miller (Respondent's Ex. A-1 at pp. 90-118). He elicited testimony from Dr. Miller that it was possible a penis could have caused the injuries inside the victim's vagina (Id. at pp. 97-98). He also elicited testimony from Dr. Miller that he could not state whether the injuries to the victim's exterior genital area were caused by blows or not (Id. at pp. 99-101). During closing argument, Mr. Sinardi extensively attacked Dr. Miller's testimony. He argued that Dr. Miller's testimony "is based on conjecture or based on probabilities and is not based on...certainty beyond and to the exclusion of every reasonable doubt." (Respondent's Ex. A-5 at pp. 574-75). He also argued that Dr. Miller could not preclude that the internal genital injuries were caused by a penis, and could not preclude that the external genital injuries were caused by a kick (Id. at pp. 577-79). He argued that Dr. Miller's testimony showed there was a lack of evidence and reasonable doubt that Taylor committed a sexual battery (Id.). Trial counsel is not ineffective for failing to retain a defense expert when doing so would be unnecessary where defense counsel can cross-examine the State's experts to establish the facts necessary for the defense. *Belcher v. State*, 961 So. 2d 239, 250 (Fla. 2007).

Moreover, to satisfy the prejudice prong under *Strickland*, Taylor must establish that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. 466 U.S. at 694. At the post-conviction hearing, Dr. Miller admitted that it was possible that the injuries to the victim's genital area were caused by a kick if the toe of the shoe penetrated the victim's vaginal area. He stated, however, that such a kick would be a "one-in-a-million shot." Dr. Lynch's testified at the evidentiary hearing that penetration caused the injuries to the victim's vagina, and that she did not believe a kick could have caused the injuries

55

unless the foot was able to fit into the vagina.  She testified that it was unlikely that Taylor's shoes would have been able to fit into the victim's vagina.  Thus, her testimony supported Dr. Miller's opinion. In light of Dr. Miller and Dr. Lynch's testimony during the post-conviction hearings regarding the cause of the injuries to the victim's genital area, Taylor has not established a reasonable probability that had counsel obtained a forensic pathologist to testify at trial, the result of the trial would have been different.

Finally, to the extent Taylor asserts an ineffective assistance of counsel claim with respect to counsel's failure to hire an expert who could have determined when the bite mark on the victim's arm was inflicted, Taylor's claim fails because he does not show any actual prejudice. Taylor does not present any scientific or medical evidence that establishes he did not inflict the bite mark on the victim's arm. Dr. Wright testified that from looking at the photographs of the bite mark, he could only determine that it was inflicted less than two to three days before the victim's death (Respondent's Ex. E-10 at pp. 1555-56).  It is wholly speculative that an independent expert would have determined that the bite mark was not inflicted at or around the time of the victim's death. Thus, Taylor fails to demonstrate prejudice because he fails to show the outcome of the trial would have been different had defense counsel hired an independent pathologist.

The state court's rejection of this claim is not an unreasonable application of *Strickland*. Accordingly, Ground Six does not warrant relief.

**Ground Seven**

"TRIAL COUNSEL IN THE 1989 GUILT PHASE COMMITTED AN UNCONSCIONABLE TACTICAL ERROR IN PLACING MR. TAYLOR ON THE STAND. COUNSEL DID NOT PREPARE MR. TAYLOR IN SUCH A MANNER TO ALLOW HIS TESTIMONY TO HAVE A

BENEFICIAL EFFECT. THESE ACTS CONSTITUTED [sic] DEPRIVED MR. TAYLOR OF THE EFFECTIVE ASSISTGANCE [sic] OF COUNSEL."

In Ground Seven, Taylor complains that trial counsel was ineffective in having Taylor testify during the guilt phase of the trial. Specifically, Taylor asserts that counsel's performance was deficient because: 1) he had Taylor take off his shirt during part of his testimony to show the jury his large muscles, and this weakened the defense theory that Taylor was a "gentle giant" and that the killing was accidental; 2) he had Taylor demonstrate for the jury how he had choked the victim, and this terrified the predominantly female jury; 3) counsel's decision to call Taylor to testify was a hasty decision, not the "product of lengthy debate or long deliberations"; and 4) he had Taylor testify without first rehearsing with or adequately preparing Taylor for his testimony, and only advised him to "tell the truth."

Taylor raised this claim in his post-conviction appeal to the Florida Supreme Court.[11] In denying the claim, the Florida Supreme Court held in pertinent part:

**Failure to Prepare Taylor to Testify**

Contrary to Taylor's assertion below, and now on appeal, trial defense counsel, Nick Sinardi, testified that he did prepare Taylor to testify, and his trial strategy was to show that Taylor did not have the intent to murder the victim. Sinardi testified that he believed it was in Taylor's best interest to take the stand in order for the jury to evaluate his defense. Further, although Sinardi testified that he did not rehearse Taylor's testimony, he did tell Taylor to testify truthfully. Because Taylor had given a detailed confession, defense counsel felt he was limited in available strategies.

After hearing defense counsel's testimony, the trial court found that Taylor failed to demonstrate any deficiency or resulting prejudice from the performance of

---

[11]Taylor raised a portion of this claim in his fourth amended Rule 3.850 post-conviction motion (Respondent's Ex. A-14 at Record page 121).

guilt phase counsel. Further, the trial court found that Sinardi made reasonable tactical decisions under the circumstances he faced and with the limited choices available.

In *Zack v. State*, 911 So. 2d 1190 (Fla. 2005), this Court rejected a similar claim:

> Zack argue[d] that trial counsel failed to adequately prepare him to testify at trial and failed to inform him about what would occur during cross-examination. Zack contend[ed] that had he been adequately prepared and informed of the hazards of cross-examination, he would not have testified. Zack stated that trial counsel gave him no choice but to testify, and that he was only told that he was going to testify after trial began.

*Id*. at 1198. The trial court found that Zack had testified on his own behalf at trial to give his version of events even on cross-examination. *Id*. at 1199. The trial court further found that Zack showed a desire to explain himself on cross-examination, and that Zack failed to show either that counsel failed to prepare him or that he suffered any prejudice. Id. at 1199-1200. This Court accepted the trial court's findings. *Id*.

This Court has also held that trial counsel cannot be deemed ineffective simply because postconviction counsel now disagrees with trial counsel's strategy or because there were other choices. *See Davis v. State*, 875 So. 2d 359, 366 (Fla. 2003) (citing *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000)); *see also Henry v. State*, 862 So. 2d 679, 681-82 (Fla. 2003) (ineffective assistance claims for reliance on theories of self-defense and diminished capacity failed because they were conclusively refuted by the record).

On the record before us, we conclude that Taylor, like Zack, has not shown that he testified against his will, nor has he met the burden to demonstrate that Sinardi's strategy was unreasonable under the circumstances, especially considering the limited choices available to the defense. Because we agree with the trial court that Taylor has failed to demonstrate deficient performance, we need not address prejudice. *See, e.g., Waterhouse v. State*, 792 So. 2d 1176, 1182 (Fla. 2001) (because *Strickland* requires both prongs, it is not necessary to address prejudice when a deficient performance has not been shown).

*Taylor v. State*, 3 So. 3d at 996-97.

The Florida Supreme Court properly rejected Taylor's claim by deferring to counsel's strategic decisions. Trial counsel must decide which strategic and tactical option to pursue, such as deciding which witness to call or defense to present. *See e.g., Dingle v. Sec'y, Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007) ("Even if counsel's decision [to not call a certain witness] appears to have been unwise in retrospect, the decision will be held to have been ineffective assistance only if it was 'so patently unreasonable that no competent attorney would have chosen it.'"), *quoting Adams v. Wainwright*, 709 F.2d 1443, 1445 (11th Cir. 1983), *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.") (en banc), and *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991) ("The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to counsel."). The only question is whether counsel's strategic decision was "reasonable." *Minton v. Sec'y, Dep't of Corr.*, 271 Fed. Appx 916, 918 (11th Cir. 2008) ("The Supreme Court has 'declined to articulate specific guidelines for appropriate attorney conduct and instead has emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' ") (quoting *Wiggins v. Smith*, 539 U.S. 510, 521 (2003)).

Mr. Sinardi testified during the post-conviction evidentiary hearing that the State had a very strong case against Taylor (Respondent's Ex. E-4 at p. 669). Taylor had confessed to killing Birch, and thus there was no issue as to who killed her (Id. at p. 670). Mr. Sinardi determined that if Taylor's confession was admitted at trial (which it was despite counsel's motion to suppress the confession), that he would have to convince the jury that this was a second-degree murder instead

59

of a first-degree murder (Id. at pp. 670-71).  In light of his investigation, Mr. Sinardi determined that

the best defense was "that it was not premeditated or felony murder, but it was in fact depraved mind

and consensual sex, second-degree murder."  (Id. at p. 627).  Mr. Sinardi was confident that he

discussed the defense with Taylor before trial, and what their options were (Id.).  Taylor was soft-

spoken, and Mr. Sinardi believed it was imperative that the jury hear him speak along with seeing

his large physical presence (Id. at pp. 662, 677).  Mr. Sinardi wanted the jury to hear how Taylor

and the victim agreed to sex in exchange for money, and how Taylor became enraged when the

victim bit his penis (Id. at pp. 678-79).  He also wanted the jury to understand that because Taylor

was extremely strong and powerful, that when he became enraged he quickly and without thinking

inflicted the massive injuries to the small female victim (Id. at pp. 678-79, 684).  Mr. Sinardi also

testified that he did not rehearse Taylor's testimony with him because it was his practice not to

rehearse defendants' testimonies since he did not believe it was beneficial (Id. at p. 678).  Mr.

Sinardi did not, however, testify that he did not discuss Taylor's testimony with him.  When asked

if he recalled discussing with Taylor how he would testify as to the incident with the victim, Mr.

Sinardi responded: "The only thing I would have told him was to testify truthfully.  You know, as

to the specifics as to what he was going to testify to is whatever discussions we have had, you know,

in the past concerning what occurred."  (Id. at p. 664).

Looking at the issue of whether the performance of Mr. Sinardi was unreasonable, this Court

cannot conclude that it was.  While there are alternate routes which could have been pursued in

presenting Taylor's defense, "the issue is not what is possible or 'what is prudent or appropriate, but

only what is constitutionally compelled.'" *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir.

2000)(en banc)(quoting *Burger v. Kemp*, 483 U.S. 776 (1987)). Counsel made a strategic decision to put Taylor on the stand to explain that he and the victim agreed to sex in exchange for money, all the sex was consensual, the victim bit his penis which sent him into a rage, and he had no intent to kill her.  Counsel also wanted the jury to see Taylor without his shirt on because he wanted to show the jury how powerful Taylor was, and that because of his significant strength, his blows quickly demolished the small female victim's body. This Court "'cannot, and will not, second guess' the 'strategic decisions trial counsel are called upon to make.'" *Kelley v. Sec'y for the Dep't of Corr.*, 377 F.3d 1317, 1353 (11th Cir. 2004)(quoting *Waters v. Thomas*, 46 F.3d 1506, 1518-19 (11th Cir. 1995)(en banc)). While there may have been alternative strategies which counsel could have pursued, it cannot be said that the decision to pursue this particular defense was objectively unreasonable.

"The Supreme Court has mandated a highly deferential review of counsel's conduct, especially where strategy is involved. Intensive scrutiny and second-guessing of attorney performance are not permitted." *Spaziano v. Singletary*, 36 F.3d 1028, 1039 (11th Cir. 1994) (citations omitted), *see also White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)("Courts also should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight.").

Whether a strategic decision was reasonable is based not upon its success, but whether it was one that could be pursued by reasonable defense attorneys. This Court concludes that counsel's decision to put Taylor on the stand and testify, and pursue the defense he presented, fell within the range of reasonable conduct.  The first prong of *Strickland*  was not met, and,  consequently, the

state courts' application of *Strickland* was not objectively unreasonable.  Accordingly, Taylor is not entitled to relief on the claim presented in Ground Seven.

**Ground Eight**

"DUE TO COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT EVIDENCE IN SUPPORT OF MITIGATING CIRCUMSTANCES, MR. TAYLOR WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SIMILAR PROVISIONS OF THE FLORIDA CONSTITUTION."

In Ground Eight, Taylor asserts that during the 1992 penalty phase retrial, counsel was ineffective in failing to adequately investigate and present available mitigating evidence.  Taylor concedes that counsel presented mitigating evidence during the penalty phase retrial, but asserts that counsel "barely scratched the surface of the available evidence that could have been presented in support of the case for his client's life."  (Dkt. 1 at p. 64).  Specifically, Taylor asserts that during the state post-conviction proceedings, "[m]ultiple witnesses...presented substantial mental health evidence which could have and should have been developed and presented in the 1992 penalty retrial."  (Id.).

Taylor avers that counsel should have had neuropsychological testing performed on Taylor which would have established that Taylor had brain damage at the time of the crime, and the results of the tests would have established two statutory mental health mitigators: 1) that the brain damage substantially impaired Taylor's ability to conform his conduct to the dictates of the law; and 2) that the offense was committed under extreme mental or emotional disturbance.  Taylor also complains that counsel should have presented testimony or evidence regarding: 1) head injuries Taylor suffered as a child; 2) his mother's severe intellectual impairment; 3) his 1992 attack on a prison guard; 4)

the abusive and violent conditions he suffered in foster care; 5) his pushing a teacher while in elementary school; and 6) abnormalities found on a PET scan image of Taylor's brain that corroborated the diagnosis of brain damage. Thus, Taylor essentially argues that counsel failed to present both evidence demonstrating the abuse he suffered as a juvenile, and evidence demonstrating that he suffers from brain damage which would qualify him for application of statutory mental health mitigators.

He also asserts counsel failed to provide the forensic psychologist, Dr. Berland, who testified of behalf of Taylor during the penalty phase retrial with adequate information to make a reliable assessment. Specifically, Taylor asserts counsel failed to provide Dr. Berland with sufficient information regarding: 1) the abusive and violent conditions Taylor suffered in a foster home; 2) medical records of Taylor or his family members; and 3) statutory mitigating circumstances that apply to capital cases in Florida.

Finally, Taylor asserts counsel was ineffective in obtaining only one court appointed mental health expert upon the false belief that there was an unwritten policy in Hillsborough County in 1992 that the circuit court would appoint no more than one mental health expert.

Taylor raised this claim in his fourth amended post-conviction motion (Respondent's Ex. E-14 at pp. 147-52). Following several evidentiary hearings, the state post-conviction court denied relief as follows:

> Mr. Taylor complains that defense counsel did not fully present his story given the numerous sources of evidence available. Mr. Taylor alleges that his mental condition was substantially impaired at the time the victim was killed but he was denied his right to a competent psychiatrist to conduct an appropriate examination and assist in the evaluation, preparation, and presentation of the defense. Mr. Taylor

claims that penalty phase counsel was ineffective in relying on only one mental health expert and failing to present additional mental health evidence. Judge Manuel Lopez, who represented Mr. Taylor at the penalty phase in 1992, was asked about two statutory mitigators. Section 921.141(6)(b), Florida Statutes - "The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance", and Section 921.141(6)(f), Florida Statutes - "The capacity of the defendant to appreciate the criminality of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired." He testified that he did conduct an investigation to see if either of the two statutory mitigators could be presented. He testified that he conducted a background investigation of the Defendant's family, his upbringing, and he retained Dr. Robert Berland, a forensic psychologist to assist him to establish these mitigators. Judge Lopez testified that if Dr. Berland had told him that they existed, he certainly would have put them on and asked for the instruction. Judge Lopez testified that he was not aware in 1992 of any other neurological — neuropsychological testing that could be conducted on Mr. Taylor that might have elaborated on the extent and nature of the brain damage.

Mr. Taylor alleges counsel failed to adequately provide Dr. Berland with medical records and brief him on the statutory mitigating circumstances that apply to capital cases. Dr. Berland presented testimony that the defendant was brain damaged and the record does not support a conclusion that he gave the defendant deficient mental health assistance. Judge Lopez agreed with the State at the evidentiary hearing that if he had called a neuropsychologist the only thing he would have been able to testify to was that he had performed testing and that in his opinion the defendant was brain damaged. Although, the defense may now have mental health witnesses they regard as being more favorable, this does mean mental health investigation conducted by Mr. Taylor's penalty phase counsel was incompetent. *See Gaskin v. State*, 822 So. 2d 1243 (Fla. 2002). The Court also finds the testimony of Dr. Taylor presented at the evidentiary hearing, that Mr. Taylor does not suffer from brain damage, highly credible. Additionally, the Court notes that both Dr. Kotler and Dr. Mayberg did not think the PET scan results of Mr. Taylor represented a significant indication of brain damage. It is not a certainty additional mental health experts would have found that Mr. Taylor was brain damaged had they been retained by Judge Lopez. Mr. Taylor argues that he lived in an abusive foster care situation. Judge Lopez agreed that part of his approach was to have the jury develop some degree of sympathy for Mr. Taylor's upbringing given the conditions of being in a foster home, not having his family around, and other evidence that might engender some compassion. He testified that he had the defendant's brother, Stanley Graham testify regarding the Defendant's deprived childhood. He also called Alvin Thomas, who had been in the same foster home as Mr. Taylor, to testify to the repercussions of bed wetting at the foster home. Mr. Taylor complains that his mother was available to testify and could have provided

mitigating information. However, the record indicates that the defendant left the decision up to the mother who did not want to remain at the courthouse during resentencing due to her health. The court does not find defendant's allegations in Claim XI support a conclusion that counsel provided him with ineffective assistance of counsel or support a reasonable belief that a different handling of these mitigating issues would have resulted in a different outcome. Claim XI of Defendant's Motion is denied.

(Respondent's Ex. E-5 at pp. 774-77).

In affirming the denial of relief on this claim, the Florida Supreme Court stated as follows:

Taylor asserts that there were more mitigating factors that could have been presented that counsel, Manuel Lopez, failed to present, but does not specify what these factors could be. Instead, Taylor attempts to demonstrate counsel's ineffectiveness by focusing solely on the number of hours Lopez spent preparing for resentencing.

We have held:

> "An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir.), *cert. denied*, 513 U.S. 1009, 115 S. Court. 532, 130 L.Ed.2d 435 (1994). The failure to do so "may render counsel's assistance ineffective." *Bolender [v. Singletary]*, 16 F.3d [1547,] 1557 [(11th Cir. 1994)]."

*Rose v. State*, 675 So. 2d 567, 571 (Fla. 1996). In *Rose*, we found counsel was ineffective where counsel made practically no investigation, and Rose was able to demonstrate substantial mitigation that counsel failed to uncover and present. *Id*. at 572. The record demonstrated that counsel was inexperienced, and this Court held that his uninformed decision did not amount to strategy. *Id*. Likewise, in *Hildwin v. Dugger*, 654 So. 2d 107 (Fla. 1995), the petitioner also was able to demonstrate mitigation that trial counsel failed to uncover. *Id*. at 110.

> The trial court found, and we conclude, that trial counsel's performance at sentencing was deficient. Trial counsel's sentencing investigation was woefully inadequate. As a consequence, trial counsel failed to unearth a large amount of mitigating evidence which could have been presented at sentencing. For example, trial counsel was not even aware of Hildwin's psychiatric hospitalizations  and suicide attempts.

*Id.* at 109.

However, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Court. 2527, 156 L. Ed. 2d 471 (2003). "Rather, in deciding whether trial counsel exercised reasonable professional judgment with regard to the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable." *Ferrell v. State*, 918 So. 2d 163, 170 (Fla. 2005) (citing *Wiggins*, 539 U.S. at 523; *Strickland*, 466 U.S. at 690-91). "When making this assessment, 'a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.' " *Ferrell*, 918 So. 2d at 170 (quoting *Wiggins*, 539 U.S. at 527). Ultimately, in *Ferrell*, we agreed with the trial court's assessment that trial counsel was not deficient, stating that this was not a case where counsel presented no mitigation, nor a case where counsel made no attempt to investigate. *Id.* at 171 (citing *Torres-Arboleda v. Dugger*, 636 So. 2d 1321, 1326 (Fla. 1994)).

The record shows this is not a case where trial counsel failed to investigate and present available mitigating evidence. *Cf. Rose*, 675 So. 2d at 571-72. The trial court's findings of mitigation directly refute such a claim. Taylor does not allege that counsel made no attempt to investigate mitigation or that he failed to present something he otherwise uncovered. Importantly, Taylor makes no specific allegation of what mitigation could have been presented that counsel failed to present. Under these circumstances, we conclude Taylor has shown no error in the trial court's holding that Taylor has failed to demonstrate that counsel was deficient. Accordingly, the Court need not address prejudice. *See, e.g.*, *Waterhouse*, 792 So. 2d at 1182.

*Taylor v. State*, 3 So. 3d at 997-98.

When evaluating this claim, this Court must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'" *Stewart v. Secretary, Dept. of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough*, 459 F.3d 1217, 1242 (11th Cir. 2006)). Counsel is deficient when he "'totally fails to inquire into the defendant's past or present behavior or life history'

in a capital case. . . ." *Lynd v. Terry*, 470 F.3d 1308, 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)).

"To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, '[federal courts] reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Ward v. Hall*, 592 F.3d 1144, 1165 (11th Cir. 2010) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). This Court must "evaluate the totality of the available mitigation evidence -- both that presented at trial and at the collateral proceedings." *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000)). "If 'the available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [the defendant's] moral culpability,' *Wiggins*, 539 U.S. at 538, then prejudice has been shown." *Id.*

During the 1992 penalty phase retrial, the State presented evidence that Taylor was convicted of a prior violent felony involving the use or threat of violence, i.e., the sexual battery of a twelve year old girl. Detective George Hill testified that when Taylor was sixteen years old, Taylor had told him that he threw a twelve year old girl to the ground, attempted to put his penis inside her vagina, and put his finger inside her vagina (Respondent's Ex. B-2 at pp. 341-43). Hill indicated that Taylor told the victim that he would kill her if she told anyone what he had done to her (Id. at p. 342). As a result of the incident, Taylor was convicted of sexual battery (Id. at 343-44).

The State also presented evidence that the murder was especially heinous, atrocious, and cruel. Dr. Miller, the medical examiner, testified regarding the extensive injuries the victim sustained (Id. at pp. 282-320). He testified, for example, that every major organ of the victim's body was injured or destroyed as a result of the fatal beating she endured (Id. at p. 310).

The defense presented Corporal Borhos, a detention officer at the county jail where Taylor was held before his convictions for sexual battery and first degree murder (Respondent's Ex. B-3 at pp. 356-64). Borhos testified that during the five or six months Taylor was confined in the county jail, Taylor was allowed to reside in the general population of the jail, never had any disciplinary problems, and obeyed his orders (Id. at pp. 358-61).    Borhos also testified that after Taylor was convicted and subsequently in the county jail for court appearances, Taylor appeared to be sincere in practicing his Muslim religion (Id. at pp. 361-63).

Sgt. Sharon Smith, a detention officer at a separate county jail, testified that she had supervised Taylor daily at the jail since October 29, 1991 (Id. at pp. 366-68). She testified that she had no problems with Taylor, that he obeyed all orders, and that he never was a disciplinary problem (Id. at p. 369).

Sgt. Tammy Kirk, another detention officer at the same county jail where Sgt. Smith worked, testified that Taylor was never disruptive, was polite, obeyed all her orders, and was "definitely one of our better inmates." (Id. at 372-77).

Otis Allen, Taylor's friend, also testified. He testified that the victim came up to him, Taylor, and another friend and asked "if anybody have [sic] any crack and she wanted a trick or something." (Id. at pp. 383-84). He testified that Taylor then left with the victim (Id. at p. 384).

Alvin Thomas, who lived with Taylor for approximately six or seven months in a foster home when they were children, testified that he and Taylor were beaten every time they wet their bed (Id. at pp. 405-07). They were beaten with a hand or a switch (Id. at p. 407). He also saw Taylor beaten for no reason at all (Id.).

Taylor's grandmother, Ollie Rutlage, testified (Id. at pp. 409-19). Taylor's mother, Edwina Graham, was Rutlage's daughter (Id. at p. 410). Rutlage testified that Edwina had a brain hemorrhage when she was a young girl, and could not read or write (Id. at pp. 410-11). Rutlage stated that Taylor was in and out of foster care for several years (Id. at p. 413). She said that Taylor was a "beautiful grandson," never wanted money, and did whatever he could do for her (Id. at p. 415). She stated that Taylor had expressed great remorse over the death of the victim (Id. at pp. 415-16). She talked to Taylor every week while he was in prison, and had seen a great change in his attitude (Id. at p. 416).

Stanley Graham, Taylor's half-brother, testified (Id. at pp. 419-31) that their mother could not read or write, and was taken out of school in second grade because of health problems (Id. at p. 420). Their sister had epilepsy (Id. at p. 421). Graham had several health problems as a child, including a tumor on the brain (Id.). For the first seven years of his life, Taylor was raised by his mother and older brother and sister (Id. at pp. 421-22). His father left them when Taylor was a baby (Id. at p. 422). Taylor's father did not support the family (Id.). Their mother worked, then went on welfare (Id. at pp. 422-23). Taylor lived in foster care between the ages of 7 and 16 (Id. at p. 423). Graham only went to see Taylor once while Taylor was in foster care (Id.). He did, however, see Taylor at their school (Id. at p. 424). Taylor never came home to see his family until he was 16 years old (Id.). Taylor had expressed remorse to Graham regarding the victim's death, and expressed that he was ready to "face whatever he had to face and he was sure and [sic] and already well enough [sic] to take whatever come [sic] his way." (Id. at 424-25). Graham stated that he was

a Pentecostal preacher, their mother took them to church as children, and Taylor seemed to be devout in his religion (Id. at pp. 425-26).

Dr. Robert Berland, an experienced, board certified forensic psychologist, testified that he conducted psychological tests on Taylor; conducted a clinical interview of Taylor; reviewed records regarding Taylor from schools, the Department of Health and Rehabilitative Services, and a child service agency; reviewed police reports; and reviewed evidence from Taylor's criminal case (Id. at pp. 431-38).  Dr. Berland stated that the test results indicated that Taylor was attempting to hide or minimize his mental illness (Id. at pp. 435, 439, 454).  The test results suggested that Taylor suffered from a biologically based mental health disturbance (Id. at p. 457), likely inherited or caused by brain injury (Id. at p. 458).  The test results were also consistent with somebody who had suffered a head injury (Id. at pp. 463-64).  Dr. Berland stated that the test results indicated that Taylor had brain damage (Id. at pp. 466-69).  The records Dr. Berland reviewed regarding Taylor's behavior as a child were consistent with behavior of "a youthful brain injured person."  (Id. at p. 470).  Dr. Berland testified that there was substantial evidence indicating Taylor had brain damage (Id. at p. 472), and was likely suffering from one of two possible mental illnesses: organic personality syndrome, or organic mood disturbance (Id.).  Dr. Berland testified that Taylor's mental impairment contributed to Taylor committing the crime (Id. at pp. 473-74).  He stated that he did not have any medical information showing that Taylor suffered from brain damage (Id. at p. 485).  He did, however, state that he had no doubt in his mind that Taylor suffered from some kind of brain damage (Id. at p. 489).

During the Rule 3.850 evidentiary hearings, James McNally, the program director, clinical social worker, and psychotherapist for the Mendez Center, a Tampa facility to treat elementary school children who could not function in a regular school because of mental health and behavioral problems, testified (Respondent's Ex. E-4 at pp. 586-592).   Taylor was admitted at the Mendez Center after he became aggressive with the principal at Taylor's school (Id. at p. 589).   Taylor was in the group of children who were negative, hostile, and acted out (Id. at pp. 591-92).   McNally never saw Taylor in an episode acting out (Id. at 592).   Instead, he would seem him afterward in a counseling session, at which time Taylor was not angry (Id.).   McNally indicated that he was not contacted by anybody regarding Taylor's case until after 1992 (Id. at p. 593).

Manuel Lopez, Taylor's defense attorney during the 1992 penalty phase retrial, testified that after working six years with the State Attorney's Office, he had been in private practice from 1984 to 1992, during which he practiced almost exclusively criminal defense work (Id. at p. 595).[12]   He defended several capital cases during that period of time (Id.).   He had handled approximately 50 to 75 trials prior to representing Taylor (Id. at p. 606).   Lopez hired an investigator to obtain mitigation evidence (Id. at pp. 596-97).   At the time of Taylor's penalty phase retrial, Lopez knew about and understood the statutory mitigators in the Florida Statutes (Id. at p. 597).   Lopez stated that he conducted a background investigation of Taylor's family and upbringing, and retained Dr. Berland in order to determine whether mental health statutory mitigators could be established (Id. at p. 599).   Lopez stated that Dr. Berland was well regarded, and was extensively used as an expert

---

[12]At the time of the evidentiary hearing, Manuel Lopez was a circuit court judge in Hillsborough County, Florida (Id. at p. 594).

71

by the Public Defenders Office (Id. at p. 612). Lopez testified that he had to go to the court to get authorization to obtain Dr. Berland as a mental health expert, and believed that the court would not appoint Taylor a second mental health expert without a showing of extraordinary circumstances (Id. at pp. 599-600).

In 1992, Lopez was not aware of any neuropsychological testing that could be conducted on Taylor that would have elaborated on the extent and nature of Taylor's brain damage (Id. at 602). Lopez stated that he believed that had he obtained and called a neuropsychologist to testify on behalf of Taylor in 1992, the only thing the neuropsychologist would have been able to testify to was that he had performed testing and that in the neuropsychologist's opinion Taylor was brain damaged (Id. at p. 615). Dr. Berland gave that same testimony (Id.). Lopez did, however, state that further neuropsychological testing might have been helpful, and could have revealed the existence of statutory mental mitigation in Taylor's case (Id. at pp. 617-18).

Prior to Dr. Berland's testimony during the 1992 penalty phase trial, Lopez talked to Dr. Berland regarding his findings with respect to Taylor (Id. at pp. 603-04). Lopez did not recall whether or not he specifically spoke to Dr. Berland regarding whether he held the opinion that either of the two mental health statutory mitigators were present in Taylor's case (Id. at p. 603). Lopez testified that he thought Dr. Berland would have told him if Taylor's mental health condition rose to the level of a statutory mitigator (Id. at p. 613). Lopez stated that he did not recall talking to any witnesses to Taylor's experiences in foster care other than the ones who testified at the penalty phase retrial (Id. at pp. 604-05). Lopez testified that Taylor did not want his mother to testify during the

72

penalty phase retrial, and Taylor's mother "was pretty adamant that she didn't want to testify..." (Id. at p. 605).

Dr. Henry Dee, a clinical psychologist and clinical neuropsychologist, testified (Respondent's Ex. E-11 at pp. 1711-51). Post-conviction defense counsel hired Dr. Dee to perform a forensic neuropsychological evaluation of Taylor in 2000 (Id. at p. 1712). The bulk of Dr. Dee's evaluation of Taylor consisted of testing (Id. at p. 1713). He also reviewed various records including affidavits from Taylor's family members, previous testing by Dr. Berland, Dr. Mussenden, and Dr. Goldsmith, institutional records regarding Taylor, police reports, discovery materials from Taylor's trial, and Dr. Berland's trial testimony (Id. at pp. 1715-16). Dr. Dee testified that Dr. Berland's testing of Taylor, by itself, was insufficient to formulate meaningful conclusions concerning whether Taylor had brain damage, and the consequences of the brain damage (Id. at pp. 1716-17). He believed Dr. Berland's testing should have been followed up with a more complete battery of tests (Id. at p. 1717).

Dr. Dee administered that battery of tests to Taylor (Id.). The tests Dr. Dee gave Taylor were readily available in 1992 when Dr. Berland tested Taylor (Id.). The test results revealed evidence of brain damage, more apparent in the left hemisphere of Taylor's brain, and evidence of frontal lobe involvement as well (Id. at 1721). Dr. Dee's opinion was that Taylor suffered from brain damage (Id. at 1722). It was also his opinion that Taylor's brain damage suggested that Taylor's capacity to conform his conduct to the requirements of the law was substantially impaired (Id. at pp. 1723-24, 1748-49). Taylor's brain damage caused him to over respond to provocation (Id. at p. 1726). Dr. Dee testified that while he was interviewing Taylor at the prison, Taylor became

frighteningly angry at him because he was going to miss lunch (Id. at 1728).  Dr. Dee testified "[t]hat's the kind of inexplicable anger and rage that one sees in patients with frontal lobe injuries." (Id. at pp. 1728-29).  Dr. Dee testified that Dr. Berland had testified during the penalty phase retrial that Taylor was brain damaged (Id. at p. 1735).  Dr. Dee stated that his testing of Taylor "amplifies" Dr. Berland's findings, and that he believed the diagnosis of brain damage could not be made with "satisfactory conviction" without the additional testing he performed (Id. at p. 1737).  Dr. Dee could not say what caused Taylor's brain damage (Id. at p. 1738).

Stanley Graham testified in pertinent part that when Taylor was five years old, he saw Taylor slide down "the steps on the balance [sic]" and hit his head hard on the cement floor (Id. at p. 1755).  Taylor had a knot the size of a quarter on his head and spent the night at the hospital (Id. at pp. 1755-56).  Thereafter, Taylor started having headaches (Id. at p. 1756).  Graham saw Taylor hit his head another time while sliding down the banister (Id. at pp. 1756-57).  No one had previously asked Graham about Taylor's head injuries as a child (Id. at 1760).

Edwina Graham, Taylor's mother, testified (Id. at pp. 1762-66), in pertinent part, that she attended Taylor's trial, but "couldn't stand it" and asked to go home (Id. at pp. 1765).

Charles Kelly, a guard at the Hillsborough County Jail who was attacked by Taylor in 1992, testified (Id. at pp. 1766-76), that Taylor wanted to use the telephone at 10:00 a.m.; however, Kelly was unable to let him out of the cell to use the phone until 10:15 a.m. (Id. at p. 1786).  He and another guard placed handcuffs on Taylor's wrists (Id. at 1769).  When they went to place leg irons on Taylor, Taylor pushed the other guard to the side, attacked Kelly with a knife, and cut Kelly on the forearm (Id.; p. 1775).  The incident took place in maximum security, and there was probably

74

no chance Taylor could have escaped (Id. at p. 1770).  While Kelly and Taylor were in the medical

clinic, Taylor was quiet and just stared at Kelly (Id.).

Howard Ury, who lived in Mrs. Rutledge's foster home with Taylor, testified (Id. at pp. 1776-

1804).  He stated that Mrs. Rutledge "ruled with an iron fist."  (Id. at p. 1780).  The foster children

stayed in the back of the house, while Mrs. Rutledge's children lived in the front of the house, which

was the nicer part of the house (Id. at pp. 1780-81).  The foster children were allowed to play with

other children in the neighborhood only if one of Mrs. Rutledge's biological children was with them

(Id. at pp. 1783-84).  Mrs. Rutledge spanked the foster children for talking to other children (Id. at

p. 1784).  HRS workers came to the house periodically (Id. at p. 1785).

According to Ury, Mrs. Rutledge would spank all the foster children with a water hose (Id.

at p. 1786).  Mrs. Rutledge whipped Ury once with an extension cord, which left a scar on Ury's arm

(Id. at p. 1787).  Ury testified that Taylor was spanked, but he did not recall whether Taylor was

ever in one of the group spankings where Mrs. Rutledge spanked some of the foster children with

a hose until somebody confessed to some transgression (Id. at pp. 1786-88).  Mrs. Rutledge hit Ury

in the head once, and slammed another foster child's head into the wall once (Id. at pp. 1789).  Ury

only recalled seeing Taylor receive spankings (Id. at p. 1790).  Mrs. Rutledge took the foster

children's allowance money provided by the HRS (Id. at p. 1793).  She also took the money Ury

received from relatives, and that he earned at work (Id. at pp. 1794-95).  Ury remembered that

during his time at Mrs. Rutledge's foster home, there were "quite a few" beatings, but he could not

remember how frequently they occurred (Id. at pp. 1798-99).  A few of the foster children attempted

to run away (Id. at p. 1800).  Taylor ran away once with Ury (Id. at p. 1801).  Ury stated that nobody

ever contacted him regarding Taylor until Capital Collateral attorneys contacted him after 1995 (Id. at p. 1803).

Dr. Frank Wood, a psychologist, testified (Id. at pp. 1813-75). Dr. Wood was accepted by the court as an expert in PET scan imaging and neuropsychology (Id. at pp. 1819-20). Dr. Wood testified that PET scanning was developed in the late 1970's (Id. at p. 1825), and the PET scan administered to Taylor confirmed Dr. Dee's suspicion of left frontal lobe damage (Id. at p. 1855). He testified that there is considerable evidence linking frontal lobe damage to a risk for violent behavior (Id. at p. 1850).

Dr. William Mosman, a psychologist specializing in forensic psychology, neuropsychology and developmental psychology, testified (Id. at pp. 1876-1907). Dr. Mosman testified in pertinent part that Dr. Berland's testing of Taylor was insufficient to give a complete picture of Taylor's brain damage (Id. at pp. 1880). The full battery of neurological testing administered by Dr. Dee and Dr. Mosman was necessary (Id. at pp. 1880-81). The neuropsychological testing performed by Dr. Dee and Dr. Berland was commonly used in 1992 to evaluate death-penalty qualified defendants for possible mental health mitigation (Id. at p. 1881). Dr. Mosman testified that the PET scan results not only support the neurological testing results, but also add to the results by pinpointing "where the problem is..." (Id. at 1886). Dr. Mosman stated that although the neurological testing by Dr. Berland suggested damage to the frontal lobe of Taylor's brain, the battery of tests administered by Dr. Dee and Dr. Mosman, coupled with the PET scan results established Taylor's brain damage as "a clinical fact." (Id.).

76

Robert Norgard, a local attorney called as an expert in death penalty litigation, testified (Respondent's Ex. E-12 at pp. 1989-2009). Norgard testified in pertinent part that by the mid to late 1980's, attorneys were being taught in seminars that psychiatrists and psychologists do not have the expertise to diagnose brain damage (Id. at pp. 2003-04). Norgard stated that attorneys were being taught that they needed to present evidence of a defendant's brain damage through a neuropsychologist (Id. at 2004-06). He also testified that the assumption that defense counsel was entitled to only one mental health expert was erroneous (Id. at p. 2006). He further stated that in 1992, reasonably competent counsel in a death penalty case would make a request to the court for funds to hire additional experts if they were needed, and provide the court with a basis for the need (Id. at pp. 2007-09).

Dr. Jon Kotler, chief of nuclear medicine at Holy Cross Hospital and owner of a PET scan facility, testified (Respondent's Exs. E-12 at pp. 2010-86; E-13 at pp. 2091-141). The court accepted Dr. Kotler as an expert in the administration and interpretation of PET scans (Id. at Ex. E-12 at p. 2017). Dr. Kotler stated that he did not have experience in behavioral association of PET scanning with criminal behavior or impulsive behavior (Id.). Dr. Kotler testified that there was no available sufficient database of normal subjects with which to compare Taylor's PET scan to for diagnosis corroboration of normality or abnormality (Id. at pp. 2021-24). He stated that his "biggest critique of brain imaging at this juncture is that it's still at the level of making qualitative statements." (Id. at p. 2024). Dr. Kotler testified that if Dr. Wood had a database of 60 normal patients to compare Taylor's PET scan to for a comparison and diagnosis, it would be "totally inappropriate." (Id. at pp. 2029-32). As to Taylor's PET scan, Dr. Kotler testified that "there was

an area of mild reduction in metabolic activities relative to the contralateral side which corresponded with the left frontal cortex..." (Id. at p. 2040). He stated that based on his experience, he "didn't think that that was significant at all." (Id. at p. 2045). Dr. Kotler testified that although PET scan "technology will have growing import in years to come..." he did "not believe that the amount of tracer reduction that [he] saw [on Taylor's PET scan] was anywhere near in dimension or scope sufficient to warrant anything other than a passing note." (Id. at p. 2054). Dr. Kotler stated that he did not do a psychiatric or behavioral interpretation of Taylor's PET scan.

Dr. Helen Mayberg, a neurologist who had done PET scans since 1985, testified (Respondent's Ex. E-13 at pp. 2143-2209). The court accepted Dr. Mayberg as an expert in neurology and PET scan imaging (Id. at 2147). Dr. Mayberg stated that her impression was that Taylor's PET scan "findings were not consistent with any known diagnostic entity." (Id. at pp. 2149-50). She testified that a PET scan showing low frontal lobe activity, without further information, may indicate " a number of very clear pathological conditions or could be reflecting circumstances under which your study [sic] including certain medications." (Id. at pp. 2166-67). Dr. Mayberg testified that in 1988, PET scans were not being used to diagnose or confirm behavioral conditions (Id. at pp. 2179-80). She testified that she never met Taylor, never administered any kind of neuropsychological test to him, and did not have any knowledge in the area of statutory or nonstatutory mitigation (Id. at p. 2190). Dr. Mayberg wrote an article in which she stated in pertinent part that she was disturbed "that society is so willing to embrace the use of functional brain imaging to explain human violence." (Id. at pp. 2199-2200).

Dr. Donald Taylor, a psychiatrist who specializes in adult and forensic psychiatry, testified (Respondent's Ex. E-10 at pp. 1632-87).  The court accepted Dr. Taylor as an expert in psychiatry and forensic psychiatry (Id. at p. 1640).  Dr. Taylor stated that he reviewed records, including Dr. Berland, Dr. Wood, Dr. Dee, and Dr. Mosman's reports, and interviewed Taylor in 2004 (Id. at pp. 1641-43).  Dr. Taylor's interview with Taylor was approximately 2 hours (Id. at p. 1667).  Dr. Taylor testified that based on his examination of Taylor, it was his opinion that there was no evidence that Taylor suffers from brain damage (Id. at pp. 1650-51).  He stated that part of his conclusion was based on the fact that there was no diagnostic study documenting any structural abnormality of Taylor's brain (Id. at p. 1651).  Dr. Taylor testified that "the PET scan itself is not a - - an instrument specifically used to determine brain damage.  So, regardless of whether the PET scan was normal or not would not necessarily affect my opinion regarding brain damage."  (Id.).  He testified that Dr. Dee and Dr. Mosman's records indicated that some of Taylor's test results were interpreted to be abnormal, and some were interpreted to be normal (Id. at p. 1654).  He also stated that a person may have variable scores on neurological tests without being brain damaged (Id. at pp. 1654-55).  He testified that different individuals function better in some areas of the brain than others, and because an individual does better in some areas of testing is not in and of itself indicative of brain damage (Id. at p. 1657).

Dr. Taylor testified that neuropsychological testing is not usually used to make a diagnosis of brain damage; instead, it can be helpful in assessing the effect on cognitive functioning once brain damage has been diagnosed (Id.).  Dr. Taylor testified that he did not conduct a physical examination of Taylor, but that in most cases a physical exam is unnecessary in a psychiatric

examination (Id. at p. 1666). Dr. Taylor stated that it was possible, but unlikely, that someone with brain damage could pass the exam that he gave to Taylor, which Taylor passed (Id. at p. 1070). Dr. Taylor testified that he gave little weight to Dr. Wood's testimony regarding how he interprets PET scans and correlates them to behavioral issues because in Dr. Taylor's experience, Dr. Wood's interpretation was "beyond what most physicians associated with the field say is beyond where the field has gone." (Id. at p. 1679). He gave more weight to Dr. Kotler and Dr. Mayberg's opinions that the PET scan results were within normal limits (Id.).

Finally, in rebuttal to Dr. Taylor's testimony, Dr. Dee testified (Id. at pp. 1690-97). Dr. Dee testified that the mental status exam Dr. Taylor performed on Taylor was not a valid test by itself to determine whether "a person is suffering any kind or lesion of the nervous system..." (Id. at p. 1691). He stated that the mental status exam is used as a screening instrument to give doctors "an idea of whether or not we need to go on to do any more." (Id.). Dr. Dee testified that he did not believe Dr. Taylor understood that when Dr. Dee stated that when an individual fails a test, he meant that only people who are brain damaged have ever scored in that range (Id. at pp. 1693-94).

In sum, the record demonstrates that defense counsel, Manuel Lopez, conducted a reasonable investigation into potential mitigating evidence, and made a reasonable effort to present mitigating evidence during the 1992 penalty phase retrial. Lopez hired an investigator (Respondent's Ex. E-4 at p. 596). Lopez conducted a background investigation into Taylor's family and upbringing, and hired Dr. Berland to try to establish the mental health statutory mitigators (Id. at pp. 598-99). Lopez presented evidence through Taylor's grandmother and brother that Taylor was raised without a father, was in a foster home between the ages of 7 and 16, and expressed remorse for the victim's

80

death.  Lopez presented the testimony of Thomas who stated that Taylor was beaten with either a hand or a switch in foster care whenever he wet the bed, and saw Taylor beaten for no reason at all. Dr. Berland testified that there was substantial evidence that Taylor suffered from brain damage, and the test results were consistent with someone who had suffered a head injury.  Dr. Berland also testified that Taylor's mental impairment contributed to the commission of the murder.  Finally, Lopez presented evidence through Corporal Borhos and Sgts. Smith and Kirk that Taylor was a good prisoner who obeyed all orders, never was a disciplinary problem, and sincerely practiced his religion.

First, although Ury may have provided some more explicit details regarding Mrs. Rutledge's treatment of the foster children living with her, given Thomas' testimony during the penalty phase retrial regarding the beatings Taylor received in foster care, this Court cannot conclude that the state court's determination that counsel was not ineffective in failing to present additional testimony regarding the conditions of Taylor's foster care is objectively unreasonable. *See, e.g., Van Poyck v. Florida Dept. of Corrections*, 290 F.3d 1318, 1324 (11th Cir. 2002) ("The presentation of life-history evidence at the trial satisfied the performance element of the *Strickland* test. That additional evidence might exist does not establish defective performance. It is well-settled in this Circuit that a petitioner cannot establish an ineffective assistance claim simply by pointing to additional evidence that could have been presented.").

Second, with respect to Taylor's claim that Lopez should have called Taylor's mother to testify during the penalty phase retrial, the state court's determination that Taylor left the decision up to his mother, and she did not want to remain at the courthouse during resentencing due to her

health, is supported by the record.  Lopez intended to call Taylor's mother to testify as a mitigation

witness, but she asked to be excused from the subpoena because of her health (Respondent's Ex. B-2

at p. 249).  Taylor did not want Lopez to make Taylor's mother testify if she did not want to do so

(Id. at p. 250).  Lopez testified during the evidentiary hearing that Taylor did not want his mother

to testify, and his mother was adamant that she didn't want to testify (Respondent's Ex. E-4 at p.

605).   During the evidentiary hearing Taylor's mother stated, in pertinent part, that she attended

Taylor's trial, but "couldn't stand it" and asked to go home (Respondent's Ex. E-11. at pp. 1765-66).

Her failure to testify cannot now be laid at the feet of defense counsel.  The Court concludes that

the state court's determination that counsel was not ineffective in failing to present Edwina

Graham's testimony is not an objectively unreasonable application of *Strickland*, or an unreasonable

determination of the facts.

Third, Lopez retained Dr. Berland, a respected forensic psychologist, who unequivocally

testified that Taylor suffered from brain damage that contributed to Taylor's commission of the

crime.  Dr. Berland also testified that Taylor's profile was consistent with someone who had

suffered a head injury.  Taylor's ability to subsequently obtain a more extensive expert opinion than

Dr. Berland's opinion does not require a finding of deficient performance. *McClain v. Hall*, 552

F.3d 1245, 1253 (11th Cir. 2008) (citing *Gilliam v. Sec'y for Dep't of Corr.*, 480 F.3d 1027, 1035

(11th Cir. 2007)).

Moreover, as noted by the state courts, contradictory expert opinions were presented at the

post-conviction evidentiary hearing regarding whether Taylor has brain damage. Dr. Dee, for

example, testified that Taylor did suffer from brain damage, which qualified him for the application

of statutory mental health mitigators. However, Dr. Taylor testified that Taylor does not have brain damage. Drs. Kotler and Mayberg stated that Taylor's PET scan results were not significant and did not indicate Taylor suffered from brain damage.

Fourth, Lopez testified that he had a working knowledge of the Florida statutory mitigators, and he conducted an investigation into whether or not the two statutory mental health mitigators could be presented (Respondent's Ex. E-4 at pp. 597-98). Lopez investigated Taylor's family and upbringing, and hired Dr. Berland in an effort to establish the mental health mitigators (Id. at p. 599). During the evidentiary hearing, Lopez testified that he could not recall whether he discussed with Dr. Berland whether he had an opinion that the statutory mental health mitigators were present in Taylor's case (Id. at p. 603). He further testified that if Dr. Berland had told him that the statutory mental health mitigators were present in Taylor's case, he would have presented them during the penalty phase retrial (Id. at p. 604). Lopez also testified that prior to Taylor's case, Dr. Berland had been extensively used as an expert by the Public Defender's Office (Id. at p. 612). Lopez believed that had Taylor's condition rose to the level of a statutory mitigator, Dr. Berland would have told him so (Id. at p. 613). Lopez could have reasonably relied on Dr. Berland to notify him that a statutory mental health mitigator was present in Taylor's case. *Cf. McClain v. Hall*, 552 F.3d at 1252 ("A reasonable attorney could have expected a mental health expert to report to counsel evidence of abuse.").

Fifth, that Lopez did not make a request to the state trial court for funds to hire additional experts is not deficient performance. Lopez had learned from his experiences in prior death penalty cases that the courts in Hillsborough County would not appoint an additional mental health expert

83

without a showing of extraordinary circumstances (Respondent's Ex. E-4 at p. 600). Lopez also stated that there was a cap on these types of expenditures in death penalty cases, and defense counsel had to move for leave of court to exceed the cap (Id. at p. 616). Lopez testified that in hindsight, it was possible he could have convinced the judge to appoint a second expert, but he was not sure the judge would have done so (Id. at p. 601).

In light of conflicting medical testimony in the record, it is not clear that additional mental health experts would have found that Taylor was brain damaged, or would have established a statutory mental health mitigator. And, Taylor does not establish prejudice because he does not show that had Lopez requested a second mental health expert, the state court would have granted his request.

Finally, Taylor has not demonstrated that he was prejudiced by Lopez's failure to further investigate or present additional mitigating evidence. Three statutory aggravators were found to exist: 1) that Taylor had previously been convicted for a felony involving the use or threat of violence; 2) the capital felony was committed while Taylor was engaged in a sexual battery; and 3) that the capital felony was especially heinous, atrocious, or cruel. The jury heard how every major organ in the victim's body was either crushed, lacerated or torn. The jury also heard evidence that Taylor suffered a deprived childhood, and physical abuse as a child in foster care. The jury heard evidence from a mental health expert that Taylor had brain damage which contributed to Taylor's commission of the crime. The additional mental health evidence, including the PET scan results, regarding Taylor's alleged brain damage was contradicted by the State's experts, and therefore, had such evidence been presented, it is unclear whether any statutory mitigators would have been found.

The jury also heard evidence of Taylor's good conduct while in prison, and the remorse he felt for the victim. Finally, the state court found five non-statutory mitigators (Respondent's Ex. B-5 at pp. 815-17).

Taylor has failed to demonstrate that the state courts' determination that counsel was not ineffective in failing to adequately investigate or present mitigation evidence is an objectively unreasonable application of *Strickland*. Accordingly, Ground Eight does not warrant relief.

### Ground Nine

"REFUSAL TO CONSIDER THE TESTIMONY OF SONYA DAVIS AND DENIAL OF A CONTINUANCE TO ALLOW HER NEWLY DISCOVERED EVIDENCE TO BE DEVELOPED DEPRIVED MR. TAYLOR OF HIS RIGHTS PROTECTED BY THE FOURTH, FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."

In Ground Nine, Taylor asserts that the state post-conviction court erred in excluding proffered testimony from the victim's daughter, Sonya Davis ("Davis"), in support of Taylor's motion to amend his state post-conviction motion to add a claim that trial counsel was ineffective in failing to present Davis' testimony during the guilt phase of the trial. Taylor asserts that the State deposed Davis to respond to Taylor's motion to amend his motion for post-conviction relief. Taylor asserts that during Davis' deposition she testified that she had told a CCRC investigator that Taylor and the victim were dating each other. Davis testified that she saw Taylor and the victim together one time, one week before the victim's death (Respondent's Ex. E-15 at pp. 246, 257-61). At that time, she saw Taylor and the victim sitting close together on Davis' sister's porch (Id.). She also testified that she never knew her mother to offer sex in exchange for money or drugs (Id. at p. 244).

Taylor argues that Davis' testimony refutes any claim that when Taylor and the victim walked away together on the night of the murder, and when they engaged in sexual relations that night, it was without the victim's consent.

Taylor also asserts that Davis said her sister, perhaps other family members, and her sister's neighbors knew Taylor was dating the victim.  Thus, he asserts, the State "almost certainly" would have discovered that the victim was dating Taylor, but never disclosed this fact to the defense.  He states that collateral counsel moved for a continuance to investigate this "*Brady* claim."  The state post-conviction court, however, denied Taylor's motion to continue to call Davis to testify, or to further investigate the claim.  Taylor argues that the state post-conviction court's refusal to allow Davis to testify, and refusal to grant a continuance to allow the defense to develop the information obtained from Davis' deposition, deprived him of a fair trial, due process, and his right to confront witnesses.

Essentially, Taylor's claim is that the state post-conviction court denied him due process during the state post-conviction proceedings by failing to grant him leave to amend his post-conviction motion to add his claim that counsel was ineffective in failing to call Davis to testify.[13] This claim does not warrant federal habeas relief. It is well established in the Eleventh Circuit that a prisoner's challenge to the process afforded him in a state post-conviction proceeding does not constitute a cognizable claim for habeas corpus relief. This is so  because such a claim represents

---

[13]In Ground Nine, Taylor does not raise an ineffective assistance of counsel claim.  Nor does he raise a *Brady* violation claim.  Further, even if Taylor presented a *Brady* claim, it would be without merit because Taylor would have possessed the knowledge that he was dating the victim.  Moreover, Davis' testimony that Birch and Taylor were dating would have contradicted Taylor's testimony that he and Birch agreed to sex in exchange for money.

an attack on a proceeding collateral to the prisoner's confinement and not the confinement itself. *Carroll v. Secretary, DOC, Fl. Attorney Gen.*, 574 F.3d 1354, 1366 (11th Cir. 2009) (holding that habeas petitioner's claim, that the state court violated his due process rights when it summarily denied his post-conviction claim without an evidentiary hearing, did not state a claim on which a federal court may grant habeas relief); *Spradley v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (holding that habeas petitioner's claim that errors in Rule 3.850 proceeding violated his right to due process did not state a basis for habeas relief because the claim "[went] to issues unrelated to the cause of petitioner's detention."); *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir.2004) ("[W]hile habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief.").  The limitation on federal habeas review to claims of federal constitutional error applies with equal force when a petition, which actually involves state law issues, is couched in terms of a Fourteenth Amendment due process violation. *Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Willeford v. Estelle*, 538 F.2d 1194, 1198 (5th Cir. 1976).

Accordingly, Ground Nine does not warrant federal habeas relief.

## Ground Ten

"FLORIDA'S CAPITAL SENTENCING STATUTE IS UNCONSTITUTIONAL ON ITS FACE AND AS APPLIED IN THIS CASE BECAUSE IT FAILS TO PREVENT THE ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY, AND IT VIOLATES THE CONSTITUTIONAL GUARANTEES OF DUE PROCESS AND PROHIBITING CRUEL AND UNUSUAL PUNISHMENT."

Taylor argues that Florida's capital sentencing scheme is unconstitutional because it: 1) does not prevent arbitrary imposition of the death penalty and narrow application of the penalty to the

worst offenders; 2) does not provide any standard of proof for determining that aggravating circumstances outweigh mitigating factors; 3) does not define "sufficient aggravating circumstances;" 4) does not sufficiently define the aggravating circumstances listed in the statute; 5) does not have the independent reweighing of aggravating and mitigating circumstances; and 6) creates a presumption of death if a single aggravating circumstance is found.  Petitioner also asserts that "[t]he aggravating circumstances in the Florida capital sentencing statute have been applied in a vague and inconsistent manner, and juries receive unconstitutionally vague instructions on the aggravating circumstances."  Finally, Petitioner argues that the capital sentencing statute violates the Florida Constitution because it concerns matters of court practice and procedure, and the Florida Constitution requires the Florida Supreme Court, not the legislature, to adopt all rules for practice and procedure.

Respondent asserts that Ground Ten is procedurally barred.  The Court agrees. Taylor admits that he did not raise Ground Ten on direct appeal (Dkt. 1 at pg. 97). Issues which could have been raised on direct appeal cannot be raised in a later motion for postconviction relief. *Kennedy v. State*, 547 So.2d 912 (Fla.1989). Challenges to the constitutionality of Florida's death penalty scheme should be raised at trial and on direct appeal. *See, Allen v. State*, 854 So. 2d 1255, 1258 n. 4 (Fla.2003) (citing *Arbelaez v. State*, 775 So. 2d 909, 919 (Fla. 2000)). A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts. *Wainwright v. Sykes*, 433 U.S. 72 (1977). Taylor's constitutional challenge was cognizable at trial and direct appeal and is now procedurally barred. *See, Coleman v. Thompson*, 501 U.S. 722 (1991).

Taylor attempted to revive a defaulted constitutional challenge to Florida's capital sentencing scheme in his fourth amended post-conviction motion as Issue XVIII (Respondent's Ex. E-14 at pp. 170-71). The trial court denied the claim as procedurally barred and on the merits:

> This issue should have been raised on direct appeal. This issue has been rejected in decisions by the Florida Supreme Court. *See Elledge v. State*, 911 So. 2d 57 (Fla. 2005). Claim XVIII of Defendant's Motion is denied.

(Respondent's Ex. E-5 at p. 780).

Taylor also asserted this claim as Claim IV in his state petition for writ of habeas corpus (Respondent's Ex. E-22 at pp. 12-14).  In denying Taylor's state habeas petition, the Florida Supreme Court stated:

> In his petition for habeas corpus, Taylor argues that his death sentence is unconstitutional under *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Court. 1981, 100 L. Ed. 2d 575 (1988), and *Richmond v. Lewis*, 506 U.S. 40, 113 S. Court. 528, 121 L. Ed. 2d 411 (1992); that the jury instructions unconstitutionally diminished the jury's sense of responsibility; and that Florida's capital sentencing statute constitutes cruel and unusual punishment. We reject each of these claims on the merits. Further, we note that Taylor's constitutional claims are procedurally barred because they were not preserved on direct appeal.

*Taylor v. State*, 3 So. 3d at 999.

Claims that are procedurally defaulted in state court are not reviewable by this Court unless the petitioner can demonstrate cause for the default and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72 (1977), or can establish the kind of fundamental miscarriage of justice occasioned by a constitutional violation that resulted in the conviction of a defendant who was "actually innocent" as contemplated in *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Cause must ordinarily be something external to the defense, *Marek v. Singletary*, 62 F.3d 1295, 1302 (11th Cir. 1995), and

allegations of cause are subject to default. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000)(ineffective assistance of counsel claim asserted as cause for procedural default of another federal claim could itself be procedurally defaulted). In his reply, Taylor asserts as cause that trial counsel was ineffective in failing to preserve the issue for appeal (Dkt. 13 at p. 48).  Taylor, however, did not present this claim in state court to excuse his default (Respondent's Ex. E-14 at pp. 170-71). Any cause allegation is itself procedurally barred by the two-year limitation of Florida Rules of Criminal Procedure, Rule 3.850.  In his federal habeas petition, Taylor asserts as cause that appellate counsel rendered ineffective assistance in failing to raise the issue on appeal (Dkt. 1 at p. 97).  Taylor cursorily asserted this claim in his state petition for writ of habeas corpus (Respondent's Ex. E-22 at p. 14).   However, Taylor cannot circumvent the procedural bar of his underlying constitutional claim "through conclusory allegations that appellate counsel was ineffective." *Preston v. State*, 970 So. 2d 789, 805 (Fla. 2007) (citing *Freeman v. State*, 761 So. 2d 1055, 1067 (Fla. 2000), and *Thompson v. State*, 796 So. 2d 511, 515 n.5 (Fla. 2001) ("[Conclusory allegations of ineffective assistance of counsel] are legally and facially insufficient to warrant relief under *Strickland v. Washington*, 466 U.S. 668, 104 S. Court. 2052, 80 L. Ed. 2d 674 (1984).").  Moreover, as Taylor notes, trial counsel did not preserve the claim for appeal.  "Appellate counsel cannot be deemed ineffective for failing to raise a claim that was not preserved below or that is without merit." *Johnson v. Moore*, 837 So. 2d 343, 347 (Fla. 2002)  Not demonstrating cause, Taylor cannot avoid his default.

Further, Taylor does not show that a fundamental miscarriage of justice will occur if this Court does not reach the merits of this claim. He has no new and reliable evidence of actual

innocence. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995)("'[t]o be credible,' a claim of actual

innocence must be based on [new] reliable evidence not presented at trial.")

Accordingly, Ground Ten is procedurally barred from federal review.

## Ground Eleven

"FLORIDA'S 'FELONY MURDER' AGGRAVATING CIRCUMSTANCE VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BECAUSE IT MERELY REPEATS AN ELEMENT OF FIRST DEGREE MURDER, AND BECAUSE IT DOES NOT GENUINELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY."

In Ground Eleven, Taylor essentially asserts that Florida Statute 921.141(5), the "felony

murder" aggravating factor is unconstitutional because it repeats an element of the underlying

conviction, and because the statute does not genuinely narrow the class of persons eligible for the

death penalty. The post-conviction court denied this claim, and the Florida Supreme Court affirmed,

holding:

> As his first issue on appeal, Taylor argues that the jury should not have been allowed to consider sexual battery as an aggravating circumstance because it unconstitutionally repeats an element of first-degree murder. We have considered and rejected arguments substantially the same as this in *Stewart v. State*, 588 So. 2d 972 (Fla. 1991), and *Clark v. State*, 443 So. 2d 973 (Fla. 1983), *cert. denied*, 467 U.S. 1210, 104 S. Court. 2400, 81 L. Ed. 2d 356 (1984). Taylor's claim is without merit.

*Taylor v. State*, 638 So. 2d at 32.

The United States Supreme Court has held that it is permissible to use an element of the

underlying crime as an aggravating circumstance during the penalty phase of a trial. *See Lowenfield*

*v. Phelps*, 484 U.S. 231 (1988). *See also, Johnson v. Singletary*, 991 F.2d 663, 669 (11th Cir.

1993)("Nothing in *Stringer* indicates that there is any constitutional infirmity in the Florida statute

which permits a defendant to be death eligible based upon a felony murder conviction, and to be sentenced to death based upon an aggravating circumstance that duplicates an element of the underlying conviction.")(discussing *Stringer v. Black*, 503 U.S. 222 (1992)).  Thus, Taylor's claim that the "felony murder" aggravating factor is unconstitutional because it repeats an element of the underlying conviction is without merit.

Likewise, Taylor's claim that the  "felony murder" aggravating factor does not genuinely narrow the class of persons eligible for the death penalty is without merit.  "To pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Johnson v. Singletary*, 991 F.2d at 668 (quoting *Lowenfield*, 484 U.S. at 244) (quoting *Zant v. Stephens*, 462 U.S. 862 (1983)).  The Eleventh Circuit Court of Appeals has determined that application of Florida's felony murder aggravating circumstance is not unconstitutional because it "genuinely narrows the class of persons eligible for the death penalty." *Johnson v. Dugger*, 932 F.2d 1360, 1369 (11th Cir. 1991).  Taylor has not shown that this conclusion is in direct conflict with any Supreme Court decision.

Taylor has failed to show that the Florida Supreme Court's denial of this claim was contrary to or an unreasonable application of clearly established federal law.  Accordingly, Ground Eleven does not warrant relief.

**Ground Twelve**

"THE PROVISION OF FLORIDA'S DEATH PENALTY STATUTE WHICH ALLOWS A DEATH RECOMMENDATION TO BE RETURNED BY A BARE MAJORITY VOTE OF THE JURORS VIOLATES THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE

UNITED STATES CONSTITUTION. THE STATUTE IS ALSO UNCONSTITUTIONAL FOR ITS FAILURE TO PROVIDE ADEQUATE GUIDANCE IN FINDING AGGRAVATION AND MITIGATION."

Taylor asserts that Fla. Stat., Section 921.141 is unconstitutional because it authorizes a recommendation of death by a simple majority of the jurors, and because it does not provide adequate guidance to the jury in the finding of aggravating and mitigating circumstances. These claims were raised on direct appeal (Respondent's Ex. B-7 at pp. 32-48). The Florida Supreme Court stated that the claims had no merit and rejected them without discussion. *Taylor*, 638 So. 2d at 33.

The Florida Supreme Court has consistently upheld the constitutionality of Florida's death penalty statute. *See, e.g., Pittman v. State*, 646 So. 2d 167 (Fla. 1994), *cert. denied*, 514 U.S. 1119 (1995). In denying these claims, the Florida Supreme Court did not apply a rule that contradicted the governing law set forth in the cases of the United States Supreme Court. Further, numerous United States Supreme Court decisions have upheld the validity of Florida's death penalty. *Spaziano v. Florida*, 468 U.S. 447, 464 (1984); *Barclay v. Florida*, 463 U.S. 939 (1983); *Proffitt v. Florida*, 428 U.S. 242 (1976).

The Florida Supreme Court's denial of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Accordingly, Ground Twelve does not warrant federal habeas relief.

**Ground Thirteen**

"THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE INTENT ELEMENT OF THE 'ESPECIALLY HEINOUS. [sic] ATROCIOUS, OR CRUEL' AGGRAVATING FACTOR TO CURE THE CONSITUTIONALLY [sic] INADEQUATE STANDARD INSTRUCTION; AND ALSO ERRED IN FINDING THIS AGGRAVATING

FACTOR. AS THE REQUISITE INTENT WAS NOT PROVEN BEYOND A REASONABLE DOUBT."

Taylor complains that his rights under the Fourteenth Amendment were violated when the state trial court refused to give an instruction that a crime is unnecessarily torturous, within the meaning of the HAC aggravating factor, "if the defendant meant the victim to suffer deliberate and extraordinary mental or physical pain." He asserts that "under Florida law, it was not sufficient to show that the victim in fact suffered great pain -- the state must prove that the defendant intended to torture the victim, or that the crime was meant to be deliberately and extraordinarily painful." He further argues that had the jurors been properly instructed, they could have found that although the victim may have suffered pain, that Taylor did not intend to inflict extraordinary physical or mental pain. Finally, he argues that the trial court committed constitutional error when it found the HAC aggravator because the State did not prove beyond a reasonable doubt that Taylor intended to cause extraordinary mental or physical pain to the victim.

The Florida Supreme Court denied this claim as without merit. *Taylor v. State*, 638 So. 2d at 33. Under Florida law, the intention of the killer to inflict pain on the victim is not a necessary element of the aggravating circumstance of the crime being especially heinous, atrocious, or cruel. *Hitchcock v. State*, 755 So. 2d 638, 644 (Fla. 2000). *See also, Hoskins v. State*, 965 So. 2d 1, 15 (Fla. 2005) ("HAC does not have an intent element."). Because intent to cause the victim pain is not an element of the HAC aggravating factor, the state court's denial of Petitioner's request to instruct the jury that "the defendant meant the victim to suffer deliberate and extraordinary mental

or physical pain" was not erroneous and did not have the effect of relieving the State of its burden to prove the elements of the HAC aggravating factor.

Moreover, relief must be denied because any rational factfinder would easily conclude that the HAC aggravating factor properly applies in this case. In applying the HAC factor, the trial judge recited the following facts:

> The victim died of massive internal injuries. The injuries occurred prior to death as evidenced by the large amount of internal bleeding.  There is no evidence as to when in the course of the brutal attack the victim lost consciousness.  There is evidence that the first injury inflicted was choking of the victim.  The victim's larynx was crushed. Every major organ in the victim's body was either crushed, lacerated or torn from its position within the body. Many of the victim's ribs were broken, some of which then penetrated or tore major organs. The victim's dentures were broken in half and were found outside of the body. There was a bite mark on the victim's arm and the victim's body was dragged the length of the dugout where the attack occurred. The victim's vagina was lacerated and the outside of the vaginal area sustained a large tear. There is no evidence to suggest that the victim loss [sic] consciousness until this brutal attack began and any one of the injuries sustained would have been powerful enough and delivered with such force that the victim would have been aware of her impending death at the hands of her attacker. This circumstance was proved beyond a reasonable doubt.

(Respondent's Ex. B-5 at pp. 813-14).

Taylor does not dispute the factual support for application of this factor, he merely alleges that he did not intend to inflict pain or suffering.  However, as noted *supra*, intent is not an element of the HAC factor.   *Hoskins v. State*, 965 So. 2d at 15.  "[The HAC aggravator] focuses on the *means and manner* in which death is inflicted and the immediate circumstances surrounding the death . . . ."  *Buzia v. State*, 926 So. 2d 1203, 1211-1212 (Fla. 2006) (quoting *Barnhill v. State*, 834 So. 2d 836, 349-50 (Fla. 2002)) (emphasis in original).

Florida case law fully supports the application of the HAC factor on the facts of this case. In denying this claim, the Florida Supreme Court did not contradict the governing law set forth in the cases of the United States Supreme Court. Ground Thirteen does not warrant habeas relief.

**Ground Fourteen**

"THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY ON THE SPECIFIC NONSTATUTORY MITIGATING CIRCUMSTANCES OF A DEPRIVED CHILDHOOD AND FAMILY PROBLEMS, ORGANIC BRAIN DAMAGE, POTENTIAL FOR REHABILITATION, AND REMORSE."

Taylor complains that the trial court erred and violated his constitutional rights when it denied his request at the penalty phase retrial for a jury instruction on specific nonstatutory mitigating factors (see Respondent's Ex. B-3 at pp. 533-34). Taylor argues that without the requested special jury instruction, the jury was insufficiently guided in its consideration of nonstatutory mitigating factors. He asserts that the instruction the trial court gave "has a denigrating effect especially when contrasted with the clear and specific instructions on aggravating factors." (Dkt. 1 at p. 109).

The Florida Supreme Court denied this claim as without merit. *Taylor v. State*, 638 So. 2d at 33. Under Florida Supreme Court precedent, there is no requirement that the trial court give specific instructions on nonstatutory mitigating circumstances urged by a defendant. *See, e.g., Jones v. State*, 612 So. 2d 1370, 1375 (Fla. 1992), *cert. denied*, 510 U.S. 836 (1993); *Robinson v. State*, 574 So. 2d 108, 111 (Fla.), *cert. denied*, 502 U.S. 841 (1991). Under the Eighth and Fourteenth Amendments, a sentencing body "may not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the

defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). It is not enough "simply to allow the defendant to present mitigating evidence to the sentencer." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). To "ensure 'reliability in the determination that death is the appropriate punishment in a specific case,'" the jury "must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime." *Id.* at 328 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)) (plurality).

*Lockett* and its progeny merely require, however, that a defendant be allowed to present all mitigating evidence and that the sentencer not be precluded from considering this evidence. Accordingly, under *Lockett*, to prevail on his claim that the trial court erred in failing to instruct the jury on the specific nonstatutory mitigating factors, Taylor must establish either that the jury was instructed not to consider -- and therefore could not consider -- nonstatutory mitigating evidence, or that the trial court limited itself solely to a consideration of statutory mitigating factors in fashioning its sentence.

Trial counsel introduced evidence supporting nonstatutory mitigating aspects of Taylor's character and background.  However, nothing in the record indicates that the trial court instructed the jury not to consider the evidence of those nonstatutory mitigating factors. In fact, the judge instructed the jury, in pertinent part, as follows:

> Should you find sufficient aggravating  circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances. Among the mitigating circumstances you may consider, if established by the evidence, are:

1.     The victim was a participant in the defendant's conduct or consented to the act;

2.     Any other aspect of the defendant's character, record, or background, and any other circumstance of the offense.

* * *

If one or more aggravating circumstances are established, you should consider all the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your advisory sentence.

A mitigating circumstance need not be proved beyond a reasonable doubt by the defendant. If you are reasonably convinced that a mitigating circumstance exists, you may consider it as established.

The advisory sentence of the jury must be based upon the facts as you find them from the evidence and the law.   You should weigh the aggravating circumstances against the mitigating circumstances, and your advisory sentence must be based on these considerations.

(Respondent's Ex. B-5 at pp. 778-80).

Thus, the jury was at liberty to consider -- in addition to the statutory factors -- "any aspect of [Taylor's] character, record, or background, and any other circumstance of the offense" that would mitigate against the imposition of the death penalty based on the evidence presented. Clearly, the jury was not prevented from considering nonstatutory mitigating evidence. Nor was the jury instructed that it could not consider nonstatutory mitigating evidence. To the contrary, the jury was instructed that it was their "duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances." The Constitution requires only that the jury be permitted to consider such evidence. That it was not persuaded by this evidence does not render the resulting advisory verdict of death unconstitutionally infirm. *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992).

Consideration of such factors is "sufficient to satisfy the dictates of the Eighth Amendment." *Blystone v. Pennsylvania*, 494 U.S. 299, 308 (1990).

Taylor fails to show that he has a federal constitutional right to a jury instruction on specific nonstatutory mitigating factors, or that the circumstances of this case demonstrate that the jury's recommendation of death was unreliable. The Florida Supreme Court's resolution of this issue was not contrary to, or an unreasonable application of, established federal law. Accordingly, the Court concludes that Ground Fourteen does not warrant federal habeas relief.

**Ground Fifteen**

"THE PRIOR CONVICTION USED TO SUPPORT THE FINDINGS OF A 'PRIOR CONVICTION OF A VIOLENT FELONY' AS AN AGGRAVATING CIRCUMSTANCE WAS UNCONSTITUTIONALLY OBTAINED AND INADMISSIBLE UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION."

Taylor asserts that his rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the trial court used Taylor's 1982 sexual battery conviction to support the aggravating factor that Taylor had a "prior conviction of a violent felony." Taylor asserts that the 1982 conviction was unconstitutional because it was based on an involuntary plea of nolo contendere. He asserts that the plea was involuntary because he was unable to make a knowing and voluntary plea due to his mental condition caused by brain damage. He also asserts that his brain damage prevented him from forming the specific intent element of sexual battery. Finally, he asserts that

the prior conviction was too remote in time to be considered in aggravation because it occurred

almost seven years before the date of his 1989 capital murder trial.[14]

Taylor raised this claim in state court in his Fourth Amended Motion to Vacate

(Respondent's Ex. E-14 at pp. 159-61).  In denying the claim, the state post-conviction court stated:

> Mr. Taylor alleges that the conviction for sexual battery when he was 16 years old,
> for which he was sentenced as an adult, was unconstitutional. This conviction was
> used to support the finding of a prior conviction of a violent felony. Mr. Taylor argues
> that a plea of nolo contendere was invalid because his mental condition caused by
> organic brain damage rendered him unable to make a knowing, intelligent and
> voluntary waiver of his right to trial. Mr. Taylor also alleges that because of the brain
> damage he was incapable of forming the specific intent which is an element of sexual
> battery. This issue should have been raised on direct appeal. Mr. Taylor alleges that
> his conviction for sexual battery was too remote in time to be used as an aggravating
> circumstance. This issue should have been raised on direct appeal. In addition, there
> is no indication of ineffectiveness of counsel with regard to this claim, because the
> substantive issue has been decided against the Defendant's position. *See Kelley v.
> Dugger*, 597 So. 2d 262 (Fla. 1992). Claim XIV of Defendant's Motion is denied.

(Respondent's Ex. E-5 at pp. 778-79).

Taylor also raised this claim in his state habeas petition (Respondent's Ex. E-22 at pp. 3-6).

In denying the claim, the Florida Supreme Court stated:

> Taylor argues that his prior violent felony aggravator was invalid because his
> conviction for sexual battery in 1982 was unconstitutional because his then deficient

---

[14]In his petition, Taylor asserts that "[t]he failure of trial counsel to effectively litigate this issue is a violation of Mr. Taylor's right to effective assistance of counsel[]" and "[t]o the extent that the evidence of brain damage on direct appeal was sufficient to support the incapacity to plead or to form the necessary culpable intent, the matter should have been raised on direct appeal, and the failure to do so deprived Mr. Taylor of the effective assistance of appellate counsel." (Dkt. 1 at pp. 111).  Ground Fifteen of the petition, however, does not raise a claim of ineffective assistance of either trial or appellate counsel.  To the extent Ground Fifteen may be construed as raising those claims, the claims are vague and conclusory and do not warrant relief.  *See James v. Borg*, 24 F.3d 20 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

mental state prevented him from making a knowing, intelligent, and voluntary waiver of his right to trial in entering a plea of nolo contendere. He further argues that this 1982 conviction was too remote in time to qualify as an aggravator.

In *Nixon v. State*, 932 So. 2d 1009, 1023 (Fla. 2006), we refused to grant relief where the allegedly unlawful prior felony convictions had not been vacated and were still valid. Nixon was convicted of and received a death sentence for first-degree murder, kidnapping, and other crimes. *Id*. On appeal, he argued that the prior felonies used to support the prior felony aggravator in his case were invalid. *Id*. We held that because no court had vacated the prior convictions, *Johnson* did not apply. *Id*. The invalid conviction at issue in *Johnson* had been reversed by the New York Court of Appeals. *Johnson*, 486 U.S. at 583, 108 S.Ct. 1981.

Taylor's conviction has not been vacated by any court. Accordingly, his claim under *Johnson* must fail. We also reject Taylor's argument that the prior conviction is too remote in time, since we have held a conviction obtained thirty-two years prior to the crime in question is not too remote to be considered a valid aggravating factor. *Thompson v. State*, 553 So. 2d 153, 156 (Fla. 1989).

*Taylor v. State*, 3 So. 3d at 999-1000.

Initially, Respondent asserts that this claim is procedurally barred. The Court agrees. The state post-conviction court denied the claim on procedural grounds, concluding that the claim should have been raised on direct appeal (Respondent's Ex. E-5 at p. 778). The Florida Supreme Court, however, addressed the claim on the merits. *Taylor v. State*, 3 So. 3d at 999-1000. Nevertheless, when addressing this claim and the other claims raised in Taylor's state habeas petition, the Florida Supreme Court stated "[w]e reject each of these claims on the merits. *Further, we note that Taylor's constitutional claims are procedurally barred because they were not preserved on direct appeal*." *Taylor v. State*, 3 So.3d at 999 (emphasis added).

This Court concludes that the Florida Supreme Court issued a "plain statement" applying the independent and adequate state procedural bar to this claim. *See Harris v. Reed*, 489 U.S. at 266.

"[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.), *cert. denied sub nom. Alderman v. Thomas*, 513 U.S. 1061 (1994).  Further, the procedural rule applied by the Florida Supreme Court is firmly established and regularly followed.  *James v. Kentucky*, 466 U.S. 341, 348-49 (1984) (to be adequate to bar federal habeas review of a constitutional claim, the state procedural rule must be "firmly established and regularly followed").  *See also Smith v. Crosby*, 159 Fed. Appx. 76, 78 (11th Cir. 2005) (unpublished opinion) ("The Florida Supreme Court has held that claims that could have been raised on direct appeal are procedurally barred from collateral review...") (citing *Cherry v. State*, 659 So.2d 1069, 1072 (Fla. 1995)).

Any further attempt to exhaust this claim in state court would be futile because the claim would be time barred in state court. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 ("[I]f the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purposes of federal habeas . . ."); Fla. R. Crim. P. 3.851(d).  Taylor has not demonstrated cause and prejudice to avoid the application of procedural default.  Nor  would applying procedural default in this case result in a fundamental miscarriage of justice. *Murray v. Carrier*, 477 U.S. at 495-95. Taylor has not raised any extraordinary circumstances such as actual innocence that would excuse his procedural default.  Nor does his wholly conclusory claim that appellate counsel was ineffective in failing to raise the claim on direct appeal demonstrate cause and prejudice for his default (see Dkt. 13 at p. 53).

Moreover, even if the claim were not procedurally barred, it would fail on the merits.  In *Johnson v. Mississippi*, 486 U.S. 578 (1988) the United States Supreme Court held that the Eighth Amendment requires reexamination of a death sentence that is based in part on a reversed prior felony conviction.  Here, by contrast, Taylor's 1982 sexual battery conviction has not been vacated, but remains valid.  Taylor has cited no authority for the proposition that a prior felony conviction which remains valid and which was relied upon as an aggravating circumstance in a capital trial serves as a basis for habeas relief.  Further, Taylor has cited no authority for the proposition that his 1982 conviction was too remote in time to qualify as an aggravator.

The Florida Supreme Court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court within the meaning of 28 U.S.C. § 2254(d).  Accordingly, Ground Fifteen does not warrant habeas corpus relief.

**Ground Sixteen**

"FLORIDA'S STATUTE SETTING FORTH THE AGGRAVATING CIRCUMSTANCES TO BE CONSIDERED IN A CAPITAL CASE IS FACIALLY VAGUE AND WAS NOT CURED BY JURY INSTRUCTIONS, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SIMILAR PROVISIONS OF THE FLORIDA CONSTITUTION."

Taylor asserts that the language of the "heinous, atrocious, or cruel" and "prior violent felony" aggravating circumstances upon which the jury was instructed was unconstitutionally vague and overbroad, that the jury must receive a constitutionally adequate narrowing instruction, but received inadequate instructions regarding the elements of these aggravating circumstances, and that the State failed to prove these aggravating circumstances beyond a reasonable doubt.

Taylor raised this claim in state court in his Fourth Amended Motion to Vacate (Respondent's Ex. E-14 at pp. 162-63).  In denying this claim, the state post-conviction court stated:

> This issue should have been raised on direct appeal. Claim XV of Defendant's Motion is denied.

(Respondent's Ex. E5 at p. 779).

Taylor also raised this claim in his state habeas petition (Respondent's Ex. E-22 at pp. 6-9).

In denying the claim, the Florida Supreme Court stated:

> In his petition for habeas corpus, Taylor argues that his death sentence is unconstitutional under *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), and *Richmond v. Lewis*, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992); that the jury instructions unconstitutionally diminished the jury's sense of responsibility; and that Florida's capital sentencing statute constitutes cruel and unusual punishment. We reject each of these claims on the merits. Further, we note that Taylor's constitutional claims are procedurally barred because they were not preserved on direct appeal.
>
> * * *
>
> Taylor's claim as to the invalidity of Florida's heinous, atrocious and cruel aggravator is procedurally barred.  Taylor cannot relitigate the merits of an issue through a habeas petition or use an ineffective assistance claim to argue the merits of claims that either were or should have been raised below. *See Preston v. State*, 970 So. 2d 789, 805 (Fla. 2007); *Knight v. State*, 923 So. 2d 387, 395 (Fla. 2005). "It is important to note that habeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal or in a rule 3.850 motion, or on matters that were not objected to at trial." *Parker v. Dugger*, 550 So. 2d 459, 460 (Fla. 1989). We rejected a similar argument in *Doyle v. Singletary*, 655 So. 2d 1120, 1121 (Fla. 1995) (holding that Doyle's claim was procedurally barred because Doyle had failed to pursue the issue on appeal). As in *Doyle*, Taylor did not raise this claim on direct appeal and we now reject this habeas claim for the same reason.

*Taylor v. State*, 3 So. 2d at 999.

Initially, Respondent asserts that Ground Sixteen is procedurally barred.  The Court agrees.

Both the state post-conviction court and the Florida Supreme Court issued a "plain statement"

applying the independent and adequate state procedural bar to this claim, i.e., the claim is

procedurally barred because it was not raised on direct appeal.

Taylor has not demonstrated cause and prejudice to avoid the application of procedural

default.  Taylor appears to blame appellate counsel for failing to raise the issue on direct appeal

(Dkt. 1 at p. 114).   However, Taylor fails to demonstrate that his appellate counsel was ineffective

in failing to raise this claim on direct appeal.  His sole argument that "[a]ppellate counsel was

ineffective for failing to raise and preserve this issue on direct appeal" is, at best, vague and

conclusory. Vague, conclusory, speculative, or unsupported claims cannot support an ineffective

assistance of counsel claim. *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991), *cert. denied*,

502 U.S. 1105 (1992).  "Petitioner's bald assertions are inadequate to overcome the presumption that

counsel acted reasonably." *Esteves v. Sec'y*, 2005 U.S. Dist. LEXIS 41154 at *8 (M.D. Fla. Nov. 29,

2005) (citing *Matura v. United States*, 875 F. Supp. 235, 237 (S.D.N.Y. 1995)).  Thus, Taylor does

not show cause nor prejudice.[15]

Ground Sixteen is procedurally defaulted.  Accordingly, it does not warrant federal habeas

relief.

---

[15]Further, Taylor's ineffective assistance of appellate counsel claim appears procedurally defaulted. *See Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000).  His perfunctory statement is his state petition for writ of habeas corpus that "[a]ppellate counsel was ineffective for failing to raise and preserve this issue on direct appeal" (Respondent's Ex. E-22 at p. 9) without specific argument failed to "fairly present" the claim to the state court. *See e.g., Lawrence v. State*, 831 So. 2d 121, 133 (Fla. 2002) ("Because Lawrence's bare claim is unsupported by argument, this Court affirms the trial court's summary denial of this subclaim."); *Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990) ("Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.").

**Ground Seventeen**

"MR. TAYLOR'S RESENTENCING JURY WAS MISLED BY COMMENTS AND UNCONSTITUTIONAL INSTRUCTIONS WHICH DILUTED ITS SENSE OF RESPONSIBILITY FOR SENTENCING IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES AND FLORIDA CONSTITUTIONS."

Taylor complains that the resentencing jury was repeatedly instructed that its role was merely advisory. Specifically, he asserts that the prosecutor told the jury that they merely recommend a sentence to the judge, and the judge has the responsibility to determine the sentence. He also asserts that the court repeatedly told the jury that the court had the responsibility for deciding the sentence. He avers that the jury's sense of responsibility was diminished by the misleading comments and instructions regarding its role. He also complains that the court failed to instruct the jury that its recommendation carries great weight and will only be overridden in circumstances where no reasonable person could agree with it.

Ground Seventeen is procedurally defaulted. Taylor concedes that he did not raise this claim on direct appeal (Dkt. 1 at p. 117). Her did, however, raise the claim in both his fourth amended post-conviction motion filed in the state post-conviction court (Respondent's Ex. E-14 at pp. 164-66), and state habeas petition filed in the Florida Supreme Court (Respondent's Ex. E-22 at pp. 9-11). The state circuit court denied the claim as procedurally barred, and in the alternative, on the merits as follows:

> This issue should have been raised on direct appeal. A review of the judge's instructions shows that the jury was completely and adequately instructed. Claim XVI of Defendant's Motion is denied.

(E5/779).

The Florida Supreme Court also denied the claim as procedurally barred, and in the alternative, on the merits as follows:

> In his petition for habeas corpus, Taylor argues that his death sentence is unconstitutional under *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), and *Richmond v. Lewis*, 506 U.S. 40, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992); that the jury instructions unconstitutionally diminished the jury's sense of responsibility; and that Florida's capital sentencing statute constitutes cruel and unusual punishment. We reject each of these claims on the merits. Further, we note that Taylor's constitutional claims are procedurally barred because they were not preserved on direct appeal.

*Taylor v. State*, 3 So. 3d at 999.

"[I]f 'it fairly appears that the state court rested its decision primarily on federal law,' this Court may reach the federal question on review unless the state court's opinion contains a 'plain statement' that its decision rests upon adequate and independent state grounds." *Harris v. Reed*, 489 U.S. 255, 261 (1989) (quoting *Michigan v. Long*, 463 U.S. 1032, 1042 (1983)). "[W]here a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.), *cert. denied*, 513 U.S. 1061 (1994).

The state courts issued a "plain statement" applying an independent and adequate state procedural bar. Thus, the claim is procedurally barred unless Petitioner can show either cause and prejudice or manifest injustice. Taylor complains that trial counsel was ineffective in failing to object to the comments and instructions, request a curative instruction, and move for a mistrial. Further, he asserts appellate counsel was ineffective in failing to raise the issue on direct appeal.

Thus, it appears that Taylor contends ineffective assistance of both trial and appellate counsel constitutes cause for his procedural default.

Constitutionally ineffective assistance of counsel can constitute cause for a procedural default if that claim is not itself procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). In other words, in order for Taylor to rely on ineffective assistance of counsel as cause for his default, the "claim of ineffective assistance [of counsel must] be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Mize v. Hall*, 532 F.3d at 1192 n.5 (citation omitted). Further, a petitioner must fairly present the substance of his federal claim to the state courts in order to satisfy the exhaustion requirement. *Duncan v. Henry*, 513 U.S. 364 (1995).

Taylor did not raise his ineffective assistance of counsel contentions as an independent claim in the state courts.  Instead, he presented them in both his post-conviction motion and state habeas petition as part of his substantive claim that the jury's sense of responsibility for sentencing was diluted by the court's instructions and comment, apparently as an explanation for his failure to object at trial and raise the claim on direct appeal (Respondent's Ex. E-14 at p. 166; E-22 at p. 11). Moreover, Taylor did not present any facts or legal argument in support of his ineffective assistance of counsel contentions.  (Id.).  In Florida, a perfunctory statement without specific argument fails to "fairly present" the claim to the state court. *See e.g., Lawrence v. State*, 831 So. 2d 121, 133 (Fla. 2002) ("Because Lawrence's bare claim is unsupported by argument, this Court affirms the trial court's summary denial of this subclaim."); *Duest v. Dugger*, 555 So. 2d 849, 852 (Fla. 1990) ("Merely making reference to arguments below without further elucidation does not suffice to

preserve issues, and these claims are deemed to have been waived."). Taylor, therefore cannot assert ineffective assistance of trial and appellate counsel as cause for the procedural default of his claim.

Finally, even if Taylor's claim were not procedurally barred, it would fail on the merits. As noted in *Allen v. McNeil*, 2009 U.S. Dist. LEXIS 30694, 2009 WL 856017, 32-33 (S.D. Fla. 2009):

> *Caldwell* held it was constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that responsibility for determining appropriateness of defendant's death rests elsewhere. However, 'to establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Davis*, 119 F.3d 1471, 1482 (11th Cir. 1997). Therefore, "references to and descriptions of the jury's sentencing verdict in this case as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority are not error under *Caldwell*." *Davis*, 119 F.3d at 1482.

And, Taylor's argument is wrong factually. Although the trial court instructed the jury that "the final decision as to what punishment shall be imposed is the responsibility of the judge[,]" the court immediately thereafter instructed "[h]owever, your advisory sentence must be given great weight by the Court in determining what sentence to impose upon the defendant. And it is only under rare circumstances that the court could impose a different sentence." (Respondent's Ex. B-3 at pp. 584-85). Thus, the court's instruction did not diminish the gravity of the jury's recommendation, nor did it lessen the jury's sense of responsibility.

Moreover, the instruction properly described the role assigned to the jury under Florida law. The prosecutor told the jury during closing argument that the jury's "advisory sentence is to be given great weight by this Court in determining what punishment Mr. Taylor will receive. It must be given serious consideration by the Court." (Id. at p. 542). *See Belcher v. Sec'y, Dep't of Corr.*, 2011 U.S. App. LEXIS 10268, at *10 (11th Cir. May 20, 2011) (unpublished opinion) ("Having

reviewed the record, we cannot say that the state misrepresented the law regarding the jury's role. The remarks made by the prosecutor, viewed in context, accurately portrayed the relationship between the judge and jury and did not denigrate the jury's role in the proceedings. Indeed, the prosecutor repeatedly stressed that the jury's recommendation held 'great weight' in the judge's decision.").

Taylor has failed to establish that the state courts' rulings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law" or "was based on an unreasonable determination of the facts" in light of the evidence presented in state court. Accordingly, Ground Seventeen does not warrant habeas corpus relief.

ACCORDINGLY, the Court **ORDERS** that:

1.      Petitioner's petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

2.      The Clerk is directed to enter judgment against Petitioner, terminate any pending motions, and close this case.

**CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED**

IT IS FURTHER ORDERED that Taylor is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). Id. "A [COA] may issue … only if the applicant has made a substantial showing of the denial of a constitutional right." Id. at § 2253(c)(2). To make such a showing, Taylor "must demonstrate that reasonable jurists would find the district court's assessment of the

constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Taylor cannot make the requisite showing in these circumstances.

Finally, because Taylor is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE** and **ORDERED** in Tampa, Florida on June 1, 2011.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

SA:sfc

Copies furnished to:
Counsel/Parties of Record

S:\Even\2010\10-cv-382.deny 2254.wpd

111